# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00284-CMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    DONALD ILEY

    Defendant.

## PLEA AGREEMENT

The United States of America (the government), by and through J. Chris Larson, Assistant United States Attorney for the District of Colorado, and the defendant, Don R. Iley (also referred to in this matter as Donald Iley), personally and by counsel, Gary Lozow, submit this Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I. AGREEMENT

The defendant agrees to plead guilty to Counts 12 and 28 of the Indictment, charging violations of 18 U.S.C. § 1343 (wire fraud) and 26 U.S.C. § 7206(2) (aiding in the preparation of false tax returns).

The defendant agrees that he is responsible for an intended loss of at least $11 million dollars, which resulted in financial harm to the Internal Revenue Service (IRS) and more than 140 businesses in Colorado (see Attachment A). To the greatest extent

1

COURT EXHIBIT 1

practicable, at the time of sentencing, the government will provide the Court with the names of victims, together with amounts of actual losses that remain unpaid, such that the Court may fashion a restitution order accordingly.[1]

The defendant admits the forfeiture allegation as set forth in the Indictment and agrees that the forfeiture described therein is not excessive. The defendant agrees to fully cooperate with the government to enable the government to identify and recoup all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The defendant agrees that a money judgment will enter in the amount obtained from the scheme, less any amounts returned to victims. Moreover, any amounts recovered through such action will, subject to approval, be recommended to be applied to restitution.[2]

The defendant agrees that nothing in this agreement shall limit the IRS in its lawful examination, determination, assessment, or collection of any taxes, penalties or interest due from the defendant for the time period covered by this agreement or any other time period, and he agrees that this agreement, or any judgment, order, release, or satisfaction issued in connection with this agreement, will not satisfy, settle, or

---

[1] The parties recognize that this task is significant and complicated not merely by the scope of the defendant's conduct, but also by an ongoing bankruptcy matter, which may return monies to certain victims before sentencing in this matter. See generally 18 U.S.C. § 3663a(1)(B).

[2] The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of any judicially forfeited assets be remitted or restored to eligible victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws.

compromise the defendant's obligation to pay the balance of any remaining civil liabilities, including tax, additional tax, additions to tax, interest, and penalties, owed to the IRS for the time period covered by this agreement or any other time period.

The defendant acknowledges that, pursuant to 26 U.S.C. §§ 7402 and 7407, the United States will commence a civil action against him seeking to permanently enjoin him from tax return preparation. He agrees not to contest such action.

In exchange, the United States Attorney's Office for the District of Colorado ("the government") agrees to move at sentencing for the dismissal of the remaining counts in the Indictment.

Provided the defendant does nothing inconsistent with accepting responsibility between the date of his plea and the date of sentencing, the government will recommend that the defendant receive the maximum reduction for acceptance of responsibility and be allowed to remain on bond pending sentencing; additionally, the government will support the recommendation of the probation office regarding whether or not the defendant is allowed to voluntarily surrender after sentencing.

The government agrees to make a sentencing recommendation at the low end of the sentencing guideline range determined by the Court, as further discussed below. Should the defendant seek a variant sentence, the government will determine its position with respect to any argument that the defendant advances in support of a sentence at variance with a sentence within the applicable sentencing guideline range, and will take a position with respect to such arguments at the time of sentencing.

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction; (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 30; or (3) the government appeals the sentence imposed. If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.

## II. ELEMENTS OF THE OFFENSE(S)

The parties agree that the elements of the offense[s] to which this plea is being tendered are as follows:

The essential elements of the crime of wire fraud in violation of 18 U.S.C. § 1343 are:

*First*, the defendant devised or intended to devise a scheme to defraud or obtain money or property by means of false or fraudulent pretenses, representations or promises;

*Second*, the defendant acted with specific intent to defraud or obtain money or property by means of false or fraudulent pretenses, representations or promises;

*Third*, the defendant used interstate wire communications facilities or caused another person to use interstate communications facilities for the purpose of carrying out the scheme; and,

*Fourth*, the scheme employed false or fraudulent pretenses, representations, or promises that were material.

The essential elements of the crime of aiding or assisting in the preparation of a false or fraudulent tax return in violation of 26 U.S.C. § 7206(2) are:

*First*, the defendant aided or assisted in the preparation or presentation of an income tax return;

*Second*, the income tax return contained a false statement;

*Third*, the defendant knew the statement in the income tax return was false;

*Fourth*, the defendant acted willfully, that is, with the voluntary intent to violate a known legal duty; and,

*Fifth,* the false statement was material (e.g., it concerned a matter necessary to the correct computation of taxes owed and the statement was capable of influencing the decision of the Internal Revenue Service).

## III. STATUTORY PENALTIES

The maximum statutory penalty for a violation of 18 U.S.C. § 1343 is not more than 20 years of imprisonment; not more than $250,000 fine, or twice the amount of gain or loss (whichever is greater); not more than 3 years supervised release; $100.00 special assessment fee; and, restitution.

The maximum statutory penalty for a violation of 26 U.S.C. § 7206(2) is not more than 3 years of imprisonment; not more than $250,000 fine, or twice the amount of gain or loss (whichever is greater); not more than 3 years supervised release; $100.00 special assessment fee; and, restitution.

The Court will impose a separate sentence on each count of conviction and may, to the extent permitted by law, impose such sentences either concurrently with or consecutively to each other.

If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty pleas that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which the relevant conduct began is January 2009. The parties agree to the following stipulation of facts and that the following stipulation of facts can be relied upon as relevant conduct pursuant to U.S.S.G. § 1B1.3:

At all times relevant to the conduct in this matter, the defendant, (hereafter, ILEY) was a certified public accountant and the owner/operator of a tax and accounting business known as Iley and Associates (I&A). As part of his business, ILEY provided accounting and tax preparation services to more than 140 businesses located in the State and District of Colorado. Among other things, ILEY performed payroll services.

The payroll services offered by ILEY involved calculating clients' Federal Insurance Contribution ("FICA") taxes, including social security and Medicare taxes.

At all times relevant to the Indictment in this case, ILEY knew that the Internal Revenue Code and regulations require employers, such as ILEY's business clients, to accurately report the wages paid to employees and to calculate and report to the Internal Revenue Service the amount of FICA taxes owed and withheld on a Form 941, Employer's Quarterly Federal Tax Return. ILEY knew that the Form 941 was to be filed on a quarterly basis, and is required to be submitted within one month after the conclusion of the calendar quarter to which it pertains.

ILEY performed payroll services to businesses (hereafter known as payroll clients) for whom ILEY was supposed to calculate the quarterly payroll taxes owed, prepare and file an accurate Form 941 with the IRS, and then withdraw and pay the required taxes to the IRS.

For payroll clients, ILEY instructed staff at I&A to prepare Quarterly Federal Tax Returns, including the preparation of Form 941. ILEY caused his staff at I&A to collect the necessary information from payroll clients and then prepare a Form 941 for those clients. ILEY also caused his staff to prepare an "ACH Deduction Report," which identified the payroll client's "Total Federal Payroll Tax liability" for each pay period. The ACH Deduction Report also identified other amounts to be withdrawn from each payroll client's bank account, such as the federal and state unemployment tax.

ILEY then misrepresented and caused others to misrepresent that monies withdrawn from payroll clients' bank accounts would be sent to the Internal Revenue

Service to satisfy the payroll clients' "Total Federal Payroll Tax Liability," as identified on both the ACH Deduction Report, and the Form 941, Employer's Quarterly Federal Tax Return.

ILEY then caused monies to be withdrawn from the payroll client's bank account and transferred to a bank account in the name of I&A, typically an account ending in numbers 4136 and held by US Bank (account 4136). To make deductions from client bank accounts, ILEY used Automated Clearing House transactions, which he caused others to initiate on behalf of I&A via interstate wire communications. Specifically, the Automated Clearing House transactions were initiated in Colorado via a computer at I&A, and processed in Kansas City by US Bank. Money was then withdrawn from the payroll client's bank account, as reflected on the ACH Deduction Reports, and deposited into account 4136. ILEY had sole control over account 4136. None of ILEY's employees had control over this account.

ILEY caused his employees to send a cover letter to payroll clients, which falsely represented that the Form 941 included with the letter was a file copy of the actual Form 941 filed with the IRS, and that ILEY had paid or would pay the taxes. For example, a typical cover letter read: "Please find enclosed a file copy of your 2nd quarter payroll tax filings for your records. Don Iley pays your taxes, so there is nothing more that you need to do...." ILEY knew that payroll clients would rely on the false representations in the cover letter and thereby allow ILEY to fraudulently obtain monies from their bank accounts. In fact, as part of a scheme to defraud, ILEY did not file the Form 941

included with the letter with the IRS, and ILEY had not, and would not pay the taxes he claimed to pay.

Starting in approximately January of 2009, ILEY began experimenting with the fraudulent scheme, whereby he would collect the payroll tax monies from certain payroll clients, but not remit these monies to the IRS.[3] By January 2011, ILEY expanded his scheme to include every payroll client with whom he did business. Specifically, from January 2011, up until December 2015, ILEY systematically retained payroll tax monies from all payroll clients for whom he was responsible for paying such taxes.[4] By his own estimate, he stole at least $11 million dollars from his payroll clients during this time

---

[3] In January of 2010, ILEY entered into a stipulation with the State Board of Accountancy for failing to remit taxes on behalf of a client, notwithstanding having received sufficient funds from the client to make these payments. While ILEY was originally supposed to be under practice monitoring for five years, he requested and received early termination of practice monitoring in 2013. To obtain that early release from practice monitoring, in April 2013, among other things, ILEY informed the State Board of Accountancy that:

> "I have learned a great deal from this process, including focusing closely on accuracy, diligence, absolute candor with clients, appropriate delegation of tasks to staff and close supervision of everyone involved in the tax preparation process. I have increased my efforts in all areas, and as the practice monitor's reports show, my office is thankfully showing great improvement, including no issues with my office's tax preparation."

Order of Summary Suspension, State Board of Accountancy, (Case Nos. 2015-4546, 2015-4675, 2015-4679 and 2015-4911), at 1-2, December 21, 2015.

[4] The Defendant maintains that this scheme did not extend to state or local taxes and that his firm paid his clients' state and local taxes.

frame. Attachment A contains a list of the names of the payroll clients from whom ILEY fraudulently stole payroll tax funds.

To facilitate his scheme to defraud during this period of time, ILEY prepared, signed and then mailed to the Internal Revenue Service a false Form 941 for each payroll client. On a quarterly basis, each false Form 941 claimed that the payroll client had no payroll taxes due and owing.

To make these forms appear legitimate, ILEY used his company's computer system – called Easy Act. ILEY called up the electronic version of the Form 941 that had been prepared for and sent to each client for each quarter. In the I&A computer system, the electronic Form 941 correctly indicated that the client owed payroll taxes. ILEY accessed the electronic form and, without changing the original electronic file, ILEY temporarily inserted the number zero ("0") in key entries, falsely indicating that the client had paid no wages that quarter and therefore owed no payroll taxes. ILEY then printed out that form with the false information and left the original electronic version unchanged in the I&A computer system. ILEY then took the false form that he had printed and signed the form in the name of I&A under penalty of perjury. He then mailed the false Form 941 to the Internal Revenue Service.

As an example, WRG was a client of ILEY and a victim of ILEY's fraud. On December 16, 2014, at 3:19pm, ILEY sent an email to his employees at I&A indicating that ILEY "[j]ust talked with [payroll client W.R.G.] about his year end payroll. For December, make it $50,000 gross, 15% 401k contribution, $4,000 withheld for state, and the remainder for federal withholding. Net on the check should be zero. Thanks"

The next day, on December 17, 2014, an I&A employee emailed [payroll client W.R.G.] and confirmed an aspect of the transaction. ILEY's employee then prepared an ACH Deduction Report, which showed a "Total Federal Payroll Tax Liability" of $42,325.00, and a Total ACH Deduction of $46,325.00 to be withdrawn from W.R.G.'s bank account.

The ACH transaction was initiated in Colorado at the I&A offices by making an electronic request through a login with US Bank. US Bank in turn processed the ACH transaction in Kansas City. On December 26, 2014, "$46,325" was withdrawn from the W.R.G. Bank Account at 1st Bank, with a reference "Payroll Iley Assocs." On December 30, 2014, "$46,325" was deposited into US Bank Account No. 4136 of Iley and Associates.

W.R.G. then received a letter from I&A dated January 9, 2015, which stated: "Attached please find a File Copy of your 4th Quarter payroll tax filings …for your records. Don Iley pays your taxes, so there is nothing more that you need to…." Enclosed with the letter was a Form 941 for October, November, December of 2014. The Form 941 was stamped "FILE COPY," and indicated on line 2 that W.R.G. paid $42,500 of wages that quarter, on line 3 that $34,675 of federal income taxes had been withheld, and on line 5e, that $7,650 of Social Security and Medicare taxes were due and owing. On line 10 and line 11, respectively, $42,325 was identified as the amount of total taxes after adjustments, and the total deposits for the quarter.

"$42,325," is the same amount as the "Total Federal Payroll Tax Liability" as indicated on the ACH Deduction Report maintained in I&A records.

Instead of filing that Form 941 with the IRS, however, ILEY prepared, signed, and sent to the IRS a different and false Form 941 for the 4th Quarter of 2014. On behalf of W.R.G., ILEY falsely represented that W.R.G. had paid "0" wages on line 2, had withheld "0" income taxes on line 3, had "0" Medicare and Social Security Taxes on line 5e, and owed no taxes for the quarter. ILEY knew these statements were false. ILEY signed the form in the name of I&A under penalty of perjury, dated it 1/27/15, and sent it to the IRS.

Similarly, ILEY prepared a false Form 941 for scores of other clients, including client M.M. For example, for the second quarter of 2015, ILEY prepared, signed and sent to the IRS a false Form 941 that indicated that client M.M. had paid "0" wages on line 2, had withheld "0" income taxes on line 3, owed "0" Medicare and Social Security Taxes on lines 5a, 5c, & 5e, and owed no taxes for the quarter on line 6. ILEY knew that all of these representations were false and material to the IRS's calculation of taxes then owed. Moreover, ILEY made these false statements willfully. ILEY signed the form in the name of I&A under penalty of perjury on or about July 23, 2015, and sent it to the IRS before the deadline of July 31, 2015. In truth, that quarter, M.M. had paid $159,499.98 in wages, owed $24,403.50 in Medicare and Social Security Taxes and $24,790.44 in Federal Income tax withholding. These amounts were indicated on a copy of the Form 941, that ILEY caused I&A to send to M.M. together with a cover letter dated July 21, 2015, which read: "Please find enclosed a file copy of your 2nd quarter payroll tax filings for your records. Don Iley pays your taxes, so there is nothing more that you need to do."

ILEY knowingly, willfully and wrongfully prepared materially false Forms 941 for more than 140 payroll clients over the course of more than 5 years. See Attachment A. ILEY kept the money he received into account 4136 that was intended for payroll taxes, and instead used that money for his own purposes. For example, hundreds of thousands of dollars were used to pay personal credit card bills for ILEY and his wife. ILEY also transferred money into ILEY's personal checking account (account no 4591), where ILEY then used the money to, among other things, (1) pay at least $260,000 for the design, construction, landscaping and furnishing, of ILEY's residence, (2) make $350,000 in mortgage payments on ILEY's residence, (3) pay $900,000 in accelerated principal payments on ILEY's residence, (4) make substantial investments in businesses and retirement accounts, (5) pay at least $140,000 for college tuition and expenses for his daughters, and (6) pay hundreds of thousands of dollars in various business expenses for I&A.

In the later part of 2015, ILEY also began making payments to certain payroll clients, who had discovered ILEY's fraud and demanded payments. Between $2 and $2.4 million was returned to certain clients who confronted ILEY.

ILEY's scheme took place for approximately six years – from January 2009 to December 2015, shortly after a search warrant was executed on the I&A premises. Employees of I&A then quit the business, and I&A was shut down shortly thereafter. ILEY filed for bankruptcy, and many of his former clients appeared as creditors in the bankruptcy action.

## VI.   ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

    A.    The base guideline under §2B1.1(a)(2) is **7 levels.**

    B.    The total loss associated with the scheme to defraud is more than $9.5 million, but less than $25 million; accordingly, pursuant to §2B1.1(b)(1)(K) the offense level should be increased by **20 levels.**

    C.    The offense involved ten or more victims, pursuant to §2B1.1(b)(2)(A), the offense level is increased by **2 levels.**

    D.    The offense involved a violation of a prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the sentencing guidelines, pursuant to §2B1.1(b)(9)(C), the offense is increased by **2 levels.**[5]

    E.    The offense involved an abuse of trust; accordingly, pursuant to §3B1.3,

---

[5] The Defendant disputes the application of this guideline and reserves the right to argue that an enhancement under §2B1.1(b)(9)(C) does not apply to this offense.

    the offense level is increased **by 2 levels.**

F.    The overall offense level under §2B1.1 is estimated to be **33 levels.**

G.    Offenses under 18 U.S.C. § 1343 and 26 U.S.C. § 7206(2) are grouped pursuant to § 3D1.2(d). Specifically, § 3D1.2(d) identifies that when the offense level is determined largely on the basis of the total amount of harm or loss the offenses are to be grouped. Guidelines for § 2B1.1 (Offenses Involving Fraud or Deceit, including Wire Fraud, 18 U.S.C. § 1343) and § 2T1.1 (Fraudulent or False Returns, including 26 U.S.C. 7206(2)) are specifically identified as offenses to be grouped under § 3D1.2(d). Based on this grouping, the adjusted offense level remains at 33.

H.    Pursuant to §3E1.1(a) and (b), provided the defendant does nothing inconsistent with accepting responsibility between the date of his plea and the date of sentencing, the defendant should receive the full three-level reduction for acceptance of responsibility. **The resulting total offense level would be 30.**

I.    The parties understand that the defendant's criminal history computation is tentative. The criminal history category is ultimately determined by the Court. The information known to the parties shows that the defendant has no prior criminal history. The defendant's criminal history category is therefore tentatively estimated to be Category I.

J.    Assuming that the tentative criminal history facts above are accurate, the career offender/criminal livelihood/armed career criminal adjustments do not

apply.

K. The guideline range resulting from the estimated total offense level of 30, and the tentative Criminal History Category I, is 97-121 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the estimated offense level could conceivably result in a range from 97 months (bottom of Category I) to 210 months (top of Category VI).

L. Pursuant to guideline §5E1.2, assuming the estimated offense level above, the fine range for this offense would be $25,000 to $ 250,000, plus applicable interest and penalties.

M. Pursuant to guideline §5D1.2, if the Court imposes a term of supervised release, that term is not more than 3 years.

N. Pursuant to guideline §5E1.4, forfeiture is to be imposed upon a convicted defendant as provided by statute.

O. Pursuant to 5E1.1, the Court will order restitution for the full amount of any identifiable victim's loss.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by

the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

//

//

//

//

//

//

//

//

//

//

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 4/19/17

_____
Don Riley
Defendant

Date: 4/19/17

_____
Gary Lozow, Esq.
Attorney for Defendant

Date: 4/18/17

_____
J. Chris Larson, Esq.
Assistant U.S. Attorney

**Attachment A**, Plea Agreement, US v. Iley, Case No. 16-cr-00284-CMA

| | | |
|---|---|---|
| 303 AUTOS LLC | MESSYWORK HOUSEKEEPING LLC | AT THE CAR WASH |
| A PLUS KIDS INC | MIYABI JR EXPRESS COLORADO LLC | AUTOMOTIVE PREVENTION MAINTENANCE |
| ABC TINTING COMPANY INC | MJV CONSULITNG INCORPORATED | BACKYARDS PLUS |
| AKVIDEO INC | ML ENTERPRISES INC | BERGSTROM SOFTWARE |
| ALTITUDE MONITORING INC | MUSE INC | BRIDGES COMMUNITY HOMECARE |
| AMERICAN SECURITY PROFESSIONALS INC | NEW WORLD DISCOVERIES INC | BRIDGES COMMUNITY HOMECARE OF COLORADO SPRINGS |
| AMERIFLOOR INC | NOVICK AUTOMOTIVE INC | BRIGHTEN UP PAINTING |
| AMISH CABINET OF DENVER LLC | ORION BUILDING SYSTEMS INC | CAPITAL REMAN EXCHANGE |
| AUTO MAGIC OF COLORADO INC | PESCADOS Y MARISCOS HECTORS INC/Bellino Electric Services LLC | CIMCO CUSTOM INTERIOR MILLWORK |
| AUTOWERKS EAST INC | PNEUMATICOAT TECHNOLOGIES LLC | CLEAR CREEK WINE & SPIRIT |
| BACH PERFORMANCE LLC | POLICE PROTECTION SERVICES INC | COLORADO CUSTOM CYLINDER |
| BLUE ROCK ENTERPRISES LLC | REALITY TECHNOLOGY INC | COLORADO HARD SURFACES |
| BLUE SKY MOBILE CATERING | RECIPE BOX INC | DONOVAN ARBORISTS |
| BLUEWATER PERFORMANCE | REDWINKS ENTERPRISES LLC | EXTENDEED |
| BOMBAY GROUP INC | REIGN OF FIRE LLC | EXTREME TENT EVENT & PARTY |
| BONOS DRY CREEK LLC | RIDGELINE REMODELING INC | FARRELLS EXTREME BODY SHAPING |
| BONOS WEST LLC | RISING STAR ENTERPRISES LLC | FRANKLIN AUTOMOTIVE |
| BOULDER PIANO GALLERY LLC | ROCKY MOUNTAIN ADHESIVES LLC | HART CONCRETE |
| BRADLEY BROTHERS ROOFING INC | ROCKY MOUNTAIN LAWN AND LANDSCAPE | HEARING CLINIC |
| BRAZILLIAN EMPORIUM LLC | ROCKY MOUNTAIN VENTURES LLC | HIGH PLAINS RENOVATION |
| BRENDON DEGNER INC | SENIORS ROCK INC | INTERSTATE ALL BATTERY |
| C AND P ENTERPRISES LLC | SHIMI LLC | IRON MIKE CONSTRUCTION, LLC |
| COMNET SUPPORT LLC | SHR DISTRIBUTING INC | J&M GLASS |
| CT CONSULTING | SKILLS DEN LLC | KALIN CONSTRUCTION |
| DENVER CONTRACTORS INC | SLEEP TIGHT LLC | KANSAS CITY CONTRACTORS |
| ELEMENT ONE STUDIO LLC | SNH ENTERPRISES | LAND CARE MANAGEMENT |
| ERA 303 SERVICES INC | SPLAT PEST MANAGEMENT INC | LEILA CONFEL RAMIREZ, PLLC |
| EVO CONSULTING & OPERATIONS LLC | TEAL SYSTEMS LTD | LITTLE BROWN HOUSE |
| EVOO MARKETPLACE LLC | TEDS SHEDS | MATTRESS & APPLIANCE CENTER |
| FAB INDUSTRIES LLC | THAT ONE GUY INSTALLATIONS LLC | MCCULLOUGH INSURANCE AGENCY |
| GLAZE CAKES LLC | TODD MARGULIES LLC | PAYLESS ROOTER |
| GRAPE EXPECTATIONS LLC | TONERSTORE INC (Gilman Resources Inc) | PEAK PRO COMMERCIAL SVCS |
| HAWAIIAN JELLYS LLC | TRIBOLOGIX INC | PEAK PRO PAINTING, LLC |
| HIRAM E LICEA AGENCY LLC | TURN II BINGO INC | PINPOINT STAFFING |
| IMAGEHUNTERS INC (Summit Audio and Video) | TWO DRAGONS LLC | PREMIER WEALTH |
| INDEPENDENT PATHWAYS INC | ULTIMATE SPECIALTIES LLC | Wright Group Event Services (RENT-RITE SUPER KEGS WEST LTD) |
| IN-SITE TELECOM INC | UNDER THE UMBRELLA CAFE AND BAKERY | ROCA FUERTE LEARNING ACADEMY |
| JC APPAREL INDUSTRIES | UNION CARWASH LLLP | SILVER AID ADVOCATES |
| JENNIFER MELTON PC | WALL STREET COM | SPECTRUM MED SPA |
| JSR CONSULTING | WELSH TRUCKING INC | THA DETAIL SHOP |
| KERMITS PRODUCTS LLC | WENER & SONS INCORPORATED | TRANSCRIBING SOLUTIONS |
| KLIPP INC | WESTERN STATES SALES INC | WAB COMPANY |
| L R CONTRACTING INC | WESTERN STORAGE AND HANDLING INC | WASHBURN, INC |
| LIFESONG SENIOR CARE LLC | WOLFE REALTY GROUP INC | Brewshine BBQ |
| LITIGATION BOUTIQUE LLC | XAVIER INC | |
| MACDONNELL CONSULTING LTD | ZOZO GROUP LLC | |
| MASTER BLASTER PLUMBING & DRAIN LLC | APEX ROOFING | |
| MATRIX TECHNOLOGIES LLC | ART'S AUTO BODY | |
| MERMAID MEDICAL INC | ASBESTOS ABATEMENT | |