**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 16-cr-00284-CMA


**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**DONALD ILEY,**

**Defendant.**

_____

**REPORTER'S PARTIAL TRANSCRIPT**
**(Sentencing Hearing - Proposed Findings)**
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 2:00 p.m. on the 13th
day of July, 2017, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
J. CHRIS LARSON, U.S. Attorney's Office - Denver, 1801
California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
GARY LOZOW, Foster Graham Milstein & Calisher, LLP, 360
South Garfield Street, 6th Floor, Denver, Colorado 80209

1                          **JULY 13, 2017**

2            (Requested proceedings.)

3            THE COURT:  I normally tell you how I am intending

4    to go.  I will go through it, but I can honestly tell you,

5    I am not really sure, and my computer has just frozen, so

6    I have to wait.  Okay.  So I will do what I normally do,

7    which is just to let you know, because this is probably

8    your first time in a sentencing like this.

9            Normally judges don't tell people what they are

10   thinking.  I think it is important to tell them so they

11   can target whatever argument they want to make to me

12   before I actually impose a sentence, so that is how I am

13   going to proceed, because that is how I've proceeded in

14   every case in the last several years.

15           So, as part of my protocol for determining whether

16   the advisory guideline range is a range that is

17   sufficient, but not greater than necessary, sentence --

18   and that is the standard I have to impose; sufficient, but

19   not greater than necessary, to achieve the objectives of

20   sentencing.  I have reviewed this presentence report.  I

21   have considered the sentencing guidelines.  And I have

22   considered the factors that are set forth in Section 18

23   United States Code Section 3553.

24           There were no requests for downward departure or

25   requests for a variant sentence in this case.  In his

1   sentencing statement, the defendant does argue for a

2   sentence at the bottom of the advisory guideline range.

3   And, as I stated earlier, the guideline range is 97 to 121

4   months.

5        He argues that he has no criminal record.  He

6   argues his status and his age.  And he indicates that a

7   lengthy incarceration, at the bottom of that guideline,

8   does assure that he will not have the opportunity nor the

9   state of mind to commit further crimes when he is

10  released.

11       The probation office recommends a guideline at the

12  higher end of the advisory guideline range due to the

13  nature and circumstances of this offense.  Mr. Iley's

14  victims entrusted him to assist and guide them with their

15  numerous financial obligations, and he took advantage of

16  that trust that was placed in him to enrich himself to a

17  degree that is not normally seen, and to me was just total

18  -- it wasn't necessary, other than to lead a lavish

19  lifestyle that you didn't earn.

20       From the victim impact statements that are written,

21  and what was spoken here today, this isn't a fraud where

22  he just lied to people and took their money, he actually

23  stole the money from their accounts.  They trusted him.

24  They gave him access to their bank accounts so he could

25  pay payroll and other tax obligations.

```
 1          He went in, took the money, and instead of paying
 2     the taxes, he put the money in his own pockets.  And then
 3     he filed false income tax records so that he wouldn't get
 4     caught and his clients wouldn't realize that he hadn't
 5     been paying the taxes for them.
 6          Many of his clients had to close their businesses.
 7     They became insolvent.  Had to dig into their savings or
 8     retirement accounts to pay the IRS taxes that they
 9     believed had been paid, and the money had been taken from
10     their account, so they are paying twice.
11          They had to make substantial changes to their
12     living arrangements, including downsizing their homes,
13     being unable to retire when they had planned.  Some of the
14     victims suffered health problems as a result of the
15     stress.  Some remain paying towards those unpaid taxes
16     while attempting to keep the businesses running.  And, as
17     indicated today, relationships suffered because that type
18     of financial stress just can destroy a family.
19          I am going to quote from a few of the victim impact
20     statements that really kind of hit home.  "Don's choice to
21     steal from us took a tremendous toll on our relationship.
22     The money we had been paying the IRS was to be a portion
23     of our salary.  As a result, we could not make payroll and
24     could not pay ourselves our salary.  My brother ended up
25     having to sell his home.  He quit the family business and
```

1    moved away.  We have not spoken since.  Now I am left

2    alone to care for my elderly parents, causing strain in my

3    marriage.  Physically, I am a wreck.  I cannot sleep.  And

4    my health is deteriorating."

5         "It was difficult to focus on my business.  I lost

6    sleep from all of the stress and worry.  Many days I was

7    so distracted that I had to go home sick.  I was

8    depressed, angry, and oftentimes numb from disbelief.

9         Further, I still have nightmares regularly and I

10   believe will not rest peacefully until this is resolved.

11   I have suffered chest pain, multiple panic attacks,

12   nausea, headaches, and severe depression.  My quality of

13   life has been extremely compromised."

14        And this victim also indicates that she may have to

15   close her business as a result of the defendant's conduct.

16        Another victim wrote, "Even when everything was

17   coming to a close during the fourth quarter of 2015, J,

18   one of the victims, called to see what was going on.  When

19   Don Iley knew that he had been caught with his hand in the

20   cookie jar, so to speak, Don answered the phone and did

21   our payroll one more time.

22        It feels like there was really a lack of conscience

23   or portrays one who maybe views themselves as beyond

24   reproach.  We believe that what has been most frustrating,

25   hurtful, anger provoking, is the loss of the precious time

1    this has caused, having so much more to wade through and

2    figure out.  Time away from our daughters, who albeit are

3    young adults, still enjoy time with their parents.

4          The bitter pill to swallow is the time it has

5    robbed from Eve, that is the wife's, aging parent.  She is

6    the only child living close to them.  Her mother is the

7    sole caretaker for her father, who suffers from dementia.

8    But the time demands of additional work to remedy this

9    situation, and taking on additional hours for financial

10    reasons, has not allowed her to spend the time with her

11    dad as he rapidly slips away or to offer her mom the break

12    she needs and deserves."

13          So, the cost of this offense, both financially and

14    emotionally to these victims, is great.  And, as was

15    testified to here today, will impact their lives for an

16    indefinite amount of time going forward.

17          Although, now that he has been caught, Mr. Iley

18    expresses, at least in writing to me, remorse for his

19    actions.  At the time he was stealing from his victims, it

20    was not because he needed to.  He was living a lavish

21    lifestyle with moneys he stole from his hardworking

22    clients.

23          He was living in a multi-million dollar home,

24    traveling with his family, paying for his children's

25    college and private school tuition, attending football

1    games in box seats, enjoying shows, and spending the

2    victims' money with no apparent remorse at the time.

3         With respect to his history and characteristics, on

4    the surface he appears to be a family man, a churchgoing

5    and law-abiding citizen.  But, as one of his victims put

6    it, "Don Iley was always so nice and also a client of my

7    tree care company.  It is his intentional deception that

8    angers me so much.  He put on a facade, and meanwhile he

9    was stealing from me the whole time."

10        This same victim stated, "I now owe the IRS $1,066

11   per month for 3 years.  This payment is huge for me and

12   will hinder the growth of my business.  With this money I

13   could have bought new equipment and hired a few more

14   workers.  Now I have this payment to repay taxes that I

15   have already paid but were knowingly stolen by Don Iley.

16        The Federal Government has never reached out to me

17   personally to ask how this crime has impacted me and my

18   business.  The IRS is not willing to work with me at all

19   on the money I have to repay them.  But the IRS is willing

20   to make a deal with a criminal such as Don Iley, who has

21   wrecked a lot of lives.  This makes me extremely angry at

22   the system.  I am being penalized for Don Iley's criminal

23   activity, and that is unfair and unjust."

24        From the victims' impact statements, both in

25   writing and what I have heard here today, it is clear to

1    me that you all didn't just accidentally cross paths with

2    Mr. Iley.  He actually sought out his victims, and he

3    focused, apparently, on small businesses, whom he knew he

4    could snow over more.  He recruited them.  He became

5    friends with them.  He even, apparently, had staff members

6    search for new clients for him.

7         His victims thought he was a friend, and he

8    betrayed them.  Not only did he ruin them financially, he

9    ruined the health and relationships of many of these

10   people.  He put them out of business.  And, as was

11   testified to here today, it wasn't just them that he

12   impacted, it was the clients they served; whether they

13   were old or needed help with their healthcare or whether

14   they were children.  It is kind of like the ripple effect.

15        And he didn't steel from them only once.  His

16   fraudulent conduct included filing false reports to the

17   IRS showing no income so that he wouldn't get caught, and

18   now that is coming back to haunt them in their retirement,

19   their Social Security payments, and having to repay the

20   taxes that were never paid.

21        As evidenced by his prior sanctions from the

22   Accountancy Board, this conduct is not the first time he

23   has been engaged in fraudulent behavior.  He was placed on

24   a probationary period for 5 years by the Accountancy Board

25   due to complaints from at least five individuals.

1          So his conduct in this case is not aberrant

2    behavior for him.  Rather, this Court is concerned that it

3    is reflective of an ongoing pattern of behavior.  As such,

4    this Court believes that there is an ongoing need to

5    protect the public from further crimes of this defendant;

6    to promote respect for the law, when he goes in and he

7    lies to them and tells them he has seen the light and the

8    error of his ways, while he is all of the time still

9    defrauding people; to afford adequate deterrence, not just

10   to him for his conduct, but for others who may be

11   considering to engage in this type of behavior.

12          And, frankly, the Court finds it really hard to

13   fathom how one person or one family could dispose of

14   almost $10 million, no matter how lavish a lifestyle they

15   are living.  Yet, the money seems to be nowhere to be

16   found.

17          This Court is disturbed by the fact that the

18   defendant has not been forthcoming and honest about his

19   financial situation.  The probation office indicates that

20   it has asked the defendant numerous times throughout the

21   presentence investigation period to provide documentation

22   of financial condition.

23          And while Mr. Iley is apparently a very smooth

24   talker and verbalized that he is very willing to provide

25   the documents and the information requested, the probation

1    office indicates that he has been only minimally

2    responsive to those requests.

3           The probation officer provided the defendant with a

4    financial affidavit to complete for purposes of the

5    presentence report.  The first copy of the affidavit was

6    returned not fully completed.  He was instructed to fill

7    it out completely and accurately and return it.  He

8    returned the affidavit, but it was not very much different

9    from what was originally submitted.

10          Apparently, in his bankruptcy proceedings, it was

11   determined that he made a $900,000 payment on his mortgage

12   within 18-months of the bankruptcy proceeding.  The

13   bankruptcy trustee believes that money was obtained

14   through this fraud.

15          And, finally, this Court believes that the

16   sentencing guidelines are quite lax when it comes to white

17   collar criminals like Mr. Iley.  One of the victims today

18   mentioned, you know, if he had mugged him on the street.

19   Well, if I had a young, uneducated person who had mugged

20   you on the street, they would be facing, even if they got

21   very little, they would be facing years in prison.  Yet,

22   with while collar criminals, who not impact just one

23   person, but hundreds of people, for millions of dollars,

24   it is often a slap on the wrist.

25          So, my view is that the sentencing guidelines are

1    very lax when it comes to white collar crime, basically

2    because those crimes are committed by educated people.

3    And, in this case, we are talking millions of dollars and

4    142 known victims.

5         So, based on my review of this case, and after

6    consideration of the 3553(a) factors, I am inclined to

7    upward vary beyond the recommended sentence of 97 to 121

8    months, and impose a sentence of 180 months as to Count

9    12, a term of 36 months as to Count 8, to run concurrently

10   to one another, supervised release for a term of 3 years

11   as to Count 12, and a term of 1 year as for Count 28, to

12   run concurrently.  I am sorry, did I say Count 8?  Count

13   28, to run concurrently to each other.  And restitution in

14   the amount of $9,718,327.68.

15        I would have liked to have put interest on that

16   amount, but we don't have enough information for me to be

17   able to make the determination that he is financially able

18   to pay the interest.  So I will not impose a fine, and I

19   will not -- because I want him to pay restitution not a

20   fine.  And I will not impose interest on the restitution.

21        So, that is my inclination, Mr. Lozow.  You can

22   make any argument you wish to persuade me otherwise or for

23   the record on appeal.  Then I will hear from Mr. Larson.

24   And, finally, Mr. Iley, if you wishes to make any

25   statement to me on your own behalf, I will hear from you.

1          MR. LOZOW:  Judge, first, let me suggest that I

2     think the Court's upward variance, if that is what

3     happens, may be in contravention of the Criminal Rule 32;

4     notice to the defendant.

5          THE COURT:  I think the Rule 32 applies to

6     departures.  I don't believe it applies to variances.

7          MR. LOZOW:  I understand.  Let me just cite for the

8     Court --

9          THE COURT:  And if that is going to be an

10    objection, I will continue this hearing.  I will give you

11    the notice, and we will come back, because that is what I

12    think is just in this case.

13         MR. LOZOW:  I understand.  I would like to at least

14    confer with my client with regard to that before we finish

15    this hearing, Judge.

16         THE COURT:  You may.  Well, let's go ahead.  And if

17    you are going to object, let's go ahead -- do you want to

18    take a break to talk to him?

19         MR. LOZOW:  If the Court wants to give me a minute

20    or two, please, I would appreciate it.

21         THE COURT:  We will go ahead and break for 5

22    minutes, and then I will be back then.

23         (A break is taken from 2:56 p.m. to 3:05 p.m.)

24         THE COURT:  You may be seated.

25         All right.  Mr. Lozow, I did, while I was out, look

1    at the case that I was relying on, <u>Irizarry v. United</u>

2    <u>States</u>, 553 U.S. 708, which essentially says that since

3    the guidelines have become advisory, <u>Burns</u>, and Rule

4    32(h), which was promulgated in response to <u>Burns</u>, no

5    longer apply, and that there is no requirement to give

6    notice for an upward variance.

7         MR. LOZOW:  Your Honor, I am familiar with that

8    case.  I would also cite to the Court <u>U.S. v. Redmond</u>,

9    which is found at -- the cross citation I have of 388

10   Fed --

11        THE COURT:  388?

12        MR. LOZOW:  388 Fed. Appx 849, 2010.  It is a 2010

13   case, which came out after <u>Irizarry</u>.

14        THE COURT:  By whom?

15        MR. LOZOW:  The Tenth Circuit.

16        THE COURT:  What does it say?

17        MR. LOZOW:  I can read from the quote, Judge.  And

18   consistent with the Court's offer to me, I talked to

19   Mr. Iley, and we would like a continuance to kind of

20   respond to the Court's decision.

21        THE COURT:  Well, I was only going to grant a

22   continuance if there was any doubt as to whether I could

23   upward vary.  So I am not interested in a continuance at

24   this time, and I think we can proceed.

25        MR. LOZOW:  Well, let me cite, then -- do you want

1    me to cite the case?

2        THE COURT:  Yes, please.

3        MR. LOZOW:  It says in Redmond that, "Sound

4    practice dictates that judges in all cases should make

5    sure that the information provided to the parties in

6    advance of the hearing, and in the hearing itself, has

7    given them an adequate opportunity to confront and debate

8    the relevant issues.  We recognize that there will be some

9    cases in which the factual basis for a particular sentence

10   will come as a surprise to a defendant or the Government.

11   The more appropriate response to such a problem is not to

12   extend the reach of Rule 32(h), but rather for a district

13   judge to consider granting a continuance when a party has

14   a legitimate basis for claiming that the surprise was

15   prejudicial."

16       THE COURT:  And how is this prejudicial or

17   surprising?

18       MR. LOZOW:  Well, I will tell you why it is, Judge.

19   Because, number one, the presentence report and the

20   probation department that recommended 110 months,

21   indicated that they saw no grounds for variance or

22   departure.  And the Government took the same position,

23   stating that they saw no grounds for a variance or

24   departure.

25       Those were the presentence reports and documents

1    that we see, which took into account, obviously, the same

2    victim statements, and I think some of the same people who

3    had put those in the record or testified today, had

4    provided statements.

5          I will tell you that I don't think it does any good

6    for the Court to hear about experience or a lawyer's

7    experience, but this decision in the last analysis is 82

8    months higher than the Government's recommended sentence,

9    and 70 months higher than the probation department's

10   recommended sentence.  I am surprised.

11         THE COURT:  Well, it is only 5 years higher than

12   the top of the advisory guideline.

13         MR. LOZOW:  Pardon me?

14         THE COURT:  It is only 5 years higher than the top

15   of the advisory guideline sentence, and it is within the

16   sentencing range that is allowed by law.

17         MR. LOZOW:  Well, I don't disagree, but it is

18   actually rather a substantial variance, in terms of what I

19   had notice of and what the Government and the probation

20   department had suggested in its paperwork.

21         Likewise -- I am not asking for a lengthy period of

22   time, but the Court made some findings with regard to its

23   thoughts about going forward, and I think it necessitates

24   me spending -- I didn't -- it wasn't my --

25         THE COURT:  Well, most of the time, Mr. Lozow, you

1    wouldn't even get the benefits of my thoughts until after

2    I had sentenced him.  That is how most of the judges do it

3    in this courthouse.  So I do it as a courtesy so that you

4    can then respond.  But you knew what his behavior was in

5    this case.  You knew what his conduct was.

6         So I don't understand how could you have been

7    caught off guard.  And you know me.  I am hard on white

8    collar criminals.

9         MR. LOZOW:  Judge, I don't think that I make it a

10   premise of mine to think that no matter what a Court's

11   philosophy is, that based upon recommendations both by the

12   Government and the probation department, that I don't

13   react to that in some way that kind of talks about my

14   preparation for this hearing.

15        I'm unprepared to answer some of the comments that

16   the Court made in its projected findings.

17        THE COURT:  Such as?

18        MR. LOZOW:  Well, things like there is $10 million

19   that is missing.  And things like he lied to the probation

20   department.  And some of the issues about --

21        THE COURT:  I didn't say he lied to the probation

22   department.  I said he was not forthcoming to the

23   probation department.  That is in the report.  And there

24   is 9.7 million that is missing.

25        MR. LOZOW:  Again, the parties have agreed to kind

1    of submit that to the Court.  And there is no dispute

2    about that, and there never has been.  As a matter of

3    fact, we spent months and months getting to that number.

4        But we are talking about an extra 5 years of a

5    man's life outside the advisory guideline with regard to

6    the case, seems to me that I should have the opportunity

7    to kind of respond, in whatever fashion the Court brought

8    it to our attention.  I appreciate the Court signalling

9    it.  Because, to be candid with the Court, I'm taken

10   aback.  I think there are things I can bring to your

11   attention, but I need some time to do that.

12       THE COURT:  Such as?

13       MR. LOZOW:  There is a bankruptcy here.  There was

14   an aggressive day in, day out issue with regard to a very,

15   very aggressive trustee.  There is some issue with regard

16   to kind of what we tried to do with the IRS.

17       THE COURT:  And what does that have to do with my

18   sentencing?

19       MR. LOZOW:  Well, again, you are varying, with

20   regard to the comments you made, based upon your

21   prediction to us about what you are going to do.

22       THE COURT:  I don't understand.  I am varying as to

23   the comments that were made?

24       MR. LOZOW:  No, no.

25       THE COURT:  That was in this the report.  The

1    report cited the bankruptcy.  That is where I took that

2    from.  You are well aware of that.  So I just need to

3    know, if you want a continuance, you are going to have to

4    do more to justify it, because I am not going to continue

5    the hearing unless you can show there was somehow some

6    real prejudice to your client.

7         MR. LOZOW:  It may be that my dependency upon both

8    the Government and the probation department's statements

9    that there is no grounds for departure or variance.  Now,

10   the Court has had this information, for the most part, for

11   a lengthy period of time.

12        THE COURT:  As have you.

13        MR. LOZOW:  Well, I have had it since about July.

14        THE COURT:  You've had it before I had it.

15        MR. LOZOW:  Well, I am assuming the Court has read

16   it, like I read it, within the last week or two.  As time

17   has gone on, we have seen corrections.  In fact, one of

18   the supplemental reports by the probation department came

19   to us within probably the last week.  Now, remember, I

20   asked for some time because of other issues that I had in

21   my practice.

22        THE COURT:  And I granted that.

23        MR. LOZOW:  But, I do think -- I do think, when you

24   are talking 5 years of a man's life --

25        THE COURT:  Well, I will tell you this.  If you

1    want a continuance, I am willing to grant a continuance,

2    but I am going to remand Mr. Iley.

3         MR. LOZOW:  Well, I think that still may be a

4    necessity.  Let me talk to Mr. Iley.  I am not quite sure.

5         THE COURT:  Well, if you want to continue, I am not

6    going to let him go free when there is 9.7 million that I

7    don't know where it is at, and the possibility that he

8    could abscond, knowing that this is what he is looking at

9    as a sentence.

10        So, if you want a continuance before I impose

11   sentence, I will do that, but I am going to remand him.

12        MR. LOZOW:  I will ask him that question if that is

13   what he wants.  The Court will also take note, I am

14   assuming, of both the recommendation of the probation

15   department and the Government concerning voluntary

16   surrender.

17        THE COURT:  I saw that, and I disagree with it.

18   And I have been burned before by defendants who, knowing

19   they are going to have a lengthy period of time,

20   absconding when there are assets that we could not account

21   for, and they have been able to take off to foreign

22   countries and have to be extradited back.  I am not going

23   to take that risk in this case.

24        MR. LOZOW:  Judge, I would suggest to you that this

25   family has moved to Kansas, and has obviously notified

1    everyone of their move.

2         THE COURT:  That was exactly what happened in the

3    other cases.  They were to the tee.  They were on a foot

4    monitor -- a leg monitor, cut it off, took off.  First

5    time they violated.  I am not taking a chance again.

6         MR. LOZOW:  I understand what the Court is saying.

7    But let me just suggest to the Court that if the Court had

8    simply sentenced consistent with the top of the

9    guideline -- Mr. Iley knew he was coming to court today to

10   face about a 10-years sentence.  He came with his wife and

11   children.  We decided not to bring the children into the

12   courtroom.  So to suggest that he would somehow abscond or

13   take a different position in this case --

14        THE COURT:  I don't know if he will.  I am not

15   taking the risk.

16        MR. LOZOW:  I understand.  You are the Judge.  May

17   I ask the defendant?

18        THE COURT:  You may.

19        MR. LOZOW:  Can we get a hearing within a few

20   weeks?

21        THE COURT:  Yes.

22        (Off-the-record discussion had.)

23        MR. LOZOW:  Your Honor, with all due respect, we

24   think Mr. Iley should be still on bond, but I understand

25   the Court's position.  I think it is important enough that

1    we do the work, that we would ask that the matter be

2    continued for a relatively short period of time.

3              THE COURT:  All right.  Ms. West -- so you want 2

4    weeks, 3 weeks?  I do start a trial the week after next

5    that goes for 2 weeks, supposedly.

6              MR. LOZOW:  I am sorry, you start a trial --

7              THE COURT:  I start a trial the 24th?

8              COURTROOM DEPUTY:  Yes, ma'am.

9              THE COURT:  But we do have the afternoons, if it

10   will not take long.  We have gone through the bulk of

11   this.  It would be argument from you and then the

12   sentencing.

13             MR. LOZOW:  Let me suggest, then, the afternoon of

14   the 21st, if you have that time or Mr. Larson has that

15   time.

16             THE COURT:  Let me see.  We have an investiture of

17   the new bankruptcy judge at that time in the afternoon.

18             MR. LOZOW:  Well, I want to have enough time to do

19   the work we need to do, Judge.

20             THE COURT:  We can do the afternoon.  Let's see, I

21   am picking the jury on Monday, so that won't work.  We can

22   do the afternoon of the 25th, at 3:00.

23             Is that correct, Ms. West?  Did I look at the

24   calendar at my calendar correctly?

25             COURTROOM DEPUTY:  Your Honor, I think that is

1  correct.  Let me check something real quick.

2        THE COURT:  The 25th at 3:00.  July 25th at 3:00

3  p.m.

4        COURTROOM DEPUTY:  Yes, ma'am, that would work.

5        MR. LOZOW:  I am sorry?

6        THE COURT:  July 25th, Tuesday, at 3:00 p.m.

7        MR. LOZOW:  I know Mr. Iley will be here, and I

8  will be here, as well.

9        THE COURT:  Mr. Larson, does that work for you?

10        MR. LARSON:  Your Honor, Government counsel can do

11  that, the 25th at 3 o'clock.  My case agent will not be

12  able to attend.

13        THE COURT:  Ms. West, would you please call the

14  Marshals.

15        I don't think we will need the case agent, do you?

16        MR. LARSON:  I suspect it will not be necessary.

17        THE COURT:  All right.  For purposes of the record,

18  then, the Court is going to -- Title 18 United States Code

19  Section 3143 states that the Court shall order that a

20  person who has been found guilty of an offense and who is

21  awaiting imposition or execution of sentence be detained

22  unless the Court finds by clear and convincing evidence

23  that the person is not likely to flee or pose a danger to

24  the safety of any other person or the community if

25  released.

1          Based on the conduct of the defendant in this case,

2     and the Court's concern that Mr. Larson may have hidden

3     sufficient assets to allow him to abscond to and live

4     comfortable in another country, the Court cannot find that

5     the defendant, by clear and convincing evidence, that he

6     is not likely to flee.  Therefore, as such, the Court

7     remands Donald Iley to the custody of the United States

8     Marshal to be held until the sentencing hearing.

9          Mr. Larson?

10          MR. LARSON:  Your Honor, I just may have misheard.

11     I think there may have been a misspeak in suggesting that

12     Government's counsel may have hidden some assets, which

13     didn't happen.

14          THE COURT:  Government counsel may have what?

15          MR. LARSON:  When I heard that read out, I heard

16     that "Mr. Larson," when you may have meant "Mr. Iley."

17          THE COURT:  I am sorry.  You're right.  I didn't

18     mean to make you the defendant.

19          The Court is concerned that Mr. Iley may have

20     hidden sufficient assets to allow him to abscond and live

21     comfortably in another country.

22          I apologize, Mr. Larson.  I was just talking to

23     you, and that is what I said.  Thank you.

24          MR. LOZOW:  Your Honor, if I can make just a short

25     record on that.  I think there is no evidence, no credible

1    or competent evidence that there is either hidden assets

2    or some reason this client would flee or any indication

3    that the Government, who has access to all of the

4    evidence, all of the history, all of the cooperation, made

5    such a request.

6        So, for purposes of the record, I think the Court's

7    findings are not supported by the record.

8        THE COURT:  Well, I have to find by clear and

9    convincing evidence that he is not likely to flee.  What I

10   am saying is, he stole $9.7 million, and it is nowhere

11   accounted for.  And all I am saying is that without it

12   being accounted for, there may be hidden sufficient assets

13   to allow him to abscond and live comfortably.

14       And with a 15-year sentence facing him, I am afraid

15   that based on my past experience with defendants who have

16   committed similar crimes and whose assets have not yet

17   been found, have absconded.

18       So, for that reason, it is your burden to prove to

19   me by clear and convincing evidence that he will not flee.

20       MR. LOZOW:  Your Honor, it is usually the

21   Government's position --

22       THE COURT:  Not after sentencing or awaiting

23   sentencing, I don't believe.

24       MR. LOZOW:  I understand.  I just want to make the

25   record.

1      I think the Government has no evidence that it

2   could submit to you in a hearing that he has $10 million

3   that he may have access to and may abscond the country.  I

4   just think there is nothing to suggest that in any

5   finding, any bankruptcy finding.  We'll supplement what is

6   going on, but I think that reflects on our concerns about

7   the Court's decision on variance.

8      THE COURT:  All right.  So, we are waiting for the

9   Marshals -- CSO are you here to take -- here they are.

10      MR. LARSON:  Your Honor, if I may, I have a few

11   obligations in the plea agreement that I want to satisfy.

12      THE COURT:  All right.

13      MR. LARSON:  The first is that the Government

14   supports the recommendation of the probation office

15   regarding whether or not the defendant is allowed to

16   voluntarily surrender.  I want to put that on the record.

17   That's our obligation.

18      Additionally, I wanted to put on the record that

19   the Government's recommendation is for a 97-month

20   sentence, assuming the guideline range is offense level

21   30.  That is also the Government's obligation under the

22   plea agreement, and I wanted to put that on the record.

23      Finally, Your Honor, with respect to forfeiture, I

24   know that this Court entered on Monday a preliminary order

25   for forfeiture.  At some point -- this may not be the

1    correct time to do it.  But, at some point we would ask

2    the Court to modify that to reflect the amount of

3    restitution in this case, which is $9,718,327.68, to be

4    subject to forfeiture as the amount that was stolen, or

5    reflects the amount that was stolen and is subject to

6    forfeiture.

7         THE COURT:  All right.  Submit that in writing as

8    amended.

9         MR. LARSON:  We will, Your Honor.  Thank you.

10        MR. LOZOW:  All right.  Your Honor, I am assuming

11   we will have at least some additional time to supplement

12   our position in advance of the hearing so at least the

13   Government has some notice of it, the Court does.  I will

14   do the best I can to get something to you in a timely

15   fashion.

16        THE COURT:  All right.  Thank you, Mr. Lozow.

17        I hereby remand the defendant to the custody of the

18   United States Marshal.

19        (Proceedings conclude at 3:22 p.m.)

20        **R E P O R T E R ' S    C E R T I F I C A T E**

21

22        I, Darlene M. Martinez, Official Certified

23   Shorthand Reporter for the United States District Court,

24   District of Colorado, do hereby certify that the foregoing

25   is a true and accurate transcript of the proceedings had

1    as taken stenographically by me at the time and place

2    aforementioned.

3            Dated this <u>14th</u> day of <u>July</u>, 2017.

4

5            _____

6            s/Darlene M. Martinez

7            RMR, CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25