### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00284-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**DONALD ILEY,**

**Defendant.**

_____

### REPORTER'S TRANSCRIPT
### (Sentencing Hearing)
_____

Proceedings before the HONORABLE CHRISTINE M. ARGUELLO, Judge, United States District Court, for the District of Colorado, commencing at 2:03 p.m. on the 13th day of July, 2017, Alfred A. Arraj United States Courthouse, Denver, Colorado.

### A P P E A R A N C E S

**FOR THE PLAINTIFF:**
J. CHRIS LARSON, U.S. Attorney's Office - Denver, 1801 California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
GARY LOZOW, Foster Graham Milstein & Calisher, LLP, 360 South Garfield Street, 6th Floor, Denver, Colorado 80209

1                              **JULY 13, 2017**

2              (Proceedings commence at 2:03 p.m.)

3              THE COURT:  You may be seated.

4              The Court calls Criminal Case No. 16-cr-00284-CMA,

5    encaptioned United States v. Donald Iley.

6              Counsel, would you please enter your appearances.

7              MR. LARSON:  Good afternoon, Your Honor, Chris

8    Larson for the United States.

9              THE COURT:  Good afternoon.

10             MR. LARSON:  With me at counsel table is Special

11   Agent George Warnock, from the IRS.

12             MR. LOZOW:  Your Honor, Gary Lozow, on behalf of

13   Mr. Iley, who is present at counsel table.

14             THE COURT:  Good afternoon.

15             All right.  For the record, the Court also notes

16   that Officer MariJo Paul, representing the United States

17   Probation Office, is also in attendance at this hearing.

18   Good afternoon.

19             PROBATION OFFICER:  Good afternoon, Your Honor.

20             THE COURT:  I acknowledge that I have a full

21   courtroom.  A lot of people are interested in this case.

22             Mr. Lozow, would you and Mr. Iley, if you would

23   please approach the podium.

24             The record shows that Mr. Iley was charged by

25   Indictment dated August 24, 2016, with 32 counts relating

1    to wire fraud, mail fraud, and aiding in the preparation

2    of false tax returns.

3        The record also shows that on April 18, 2017,

4    pursuant to a plea agreement, he entered a plea of guilty

5    to and was convicted of Count 12, charging violation of 18

6    United States Code Section 1343, wire fraud, and Count 28,

7    charging violation of 26 United States Code Section

8    7206(2), aiding in the preparation of false tax returns.

9        Why don't you come forward.  There are some seats

10   in the front row.

11       All right.  So we are here today for sentencing.  I

12   have received and reviewed the full presentence

13   investigation report dated July 6, 2017, as revised on

14   July 6, 2017, including all addenda and all of the victim

15   impact statements and Mr. Iley's letter to me, as well.

16       I have also reviewed Document No. 34, the

17   defendant's objections to the presentence report.

18       35, the defendant's sentencing statement.

19       36 and 43, the Government's response to the

20   presentence report regarding restitution.

21       39, the Government's response to the defendant's

22   objections.

23       31, the Government's motion for a 3-level decrease

24   in offense level for acceptance of responsibility.

25       30, the Government's motion to dismiss counts.

1          And No. 32, the Government's sentencing statement.

2          Are there any documents that I failed to identify

3     that I should have reviewed in preparation for this

4     hearing?

5          MR. LARSON:  No, Your Honor.

6          MR. LOZOW:  None, Your Honor.

7          THE COURT:  Mr. Lozow, have you had enough time to

8     review the presentence report with Mr. Iley?

9          MR. LOZOW:  Your Honor, I have.  We have spent some

10    considerable time regarding the report.  I must tell the

11    Court that Mr. Larson has been very resolute about getting

12    the information, and we got some documentation last night

13    concerning restitution issues.

14          I am comfortable with his representation, and have

15    been comfortable with his efforts to get to a reasonable

16    restitution figure.  My client hasn't had the opportunity

17    to read this particular document in any detail, since we

18    got it just today.

19          We went over it briefly today, and I'm comfortable

20    that it reflects what has been represented to me and what

21    the parties have discussed.

22          THE COURT:  All right.  So I just want to confirm,

23    then, that based on the third addendum, that the parties

24    both agree that the appropriate restitution amount is

25    $9,718,327.68; is that correct?

1          MR. LARSON:  That is the Government's position,

2     Your Honor.

3          MR. LOZOW:  We agree, Your Honor.

4          THE COURT:  All right.  Very good.  So, do you have

5     any concerns about Mr. Iley's ability to understand the

6     contents of the report?

7          MR. LOZOW:  No.  I think he's familiar with it,

8     understands it, and the Government has been forthcoming in

9     terms of documentation in the report.

10          THE COURT:  All right.  Mr. Iley, did you review

11     the presentence report?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Did Mr. Lozow explain the contents to

14     you?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  And do you understand the contents of

17     the report?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  All right.  Mr. Lozow, you submitted

20     Document No. 34, the defendant's objections to the

21     presentence report.  I've read your objections and the

22     probation office's and Government's response thereto.

23          We will address your objections in a few minutes.

24     But, are there any additional objections that you would

25     like to make at this time?

1           MR. LOZOW:  No, Your Honor.

2           THE COURT:  Mr. Larson, does the Government wish to

3    make any objections at this time?

4           MR. LARSON:  No, Your Honor.

5           THE COURT:  All right.  In Document No. 34, your

6    first objection was part of the stipulation of facts.  You

7    objected to the amount of money that he has paid back to

8    the victims, but I think that has all been resolved at

9    this time; is that correct?

10           MR. LOZOW:  It has, Judge.

11           THE COURT:  Objection No. 2 was an objection to

12   paragraph No. 34.  An explanation of that has been added

13   as a footnote.  Do you have any further objection to the

14   way that was covered?

15           MR. LOZOW:  No, Your Honor.

16           THE COURT:  Objection No. 3 notes that the parties

17   were working towards a stipulation.  That information was

18   noted, and we have reached a stipulation.  So I think that

19   is no longer an objection.

20           MR. LOZOW:  That is correct.

21           THE COURT:  Objection No. 4 is an objection to the

22   applied 2-level increase pursuant to United States

23   Sentencing Guideline Section 2B1.1, stating that the

24   defendant was in violation of a prior specified judicial

25   administrative order, injunction, decree, or process not

1      addressed elsewhere in the guidelines.

2            I have read the briefing on both sides.  It appears

3      to me that this was a disciplinary action that was taken

4      -- there was a disciplinary action taken against the

5      defendant.  That was due to activity that occurred prior

6      to the beginning of his fraudulent activity in this

7      offense.

8            That disciplinary action was not enforced until

9      January of 2009, at which time his CPA license was placed

10     on probation for 5 years, he was fined, and he was made

11     subject to practice monitoring because he was not

12     complying with the law.

13           The Court agrees with the Government that this is

14     more than sufficient to deliver a message to Mr. Iley that

15     he needed to stop engaging in the prohibitive activity.

16           As recounted in the plea agreement in 2013, in

17     order to obtain early release from the monitoring, the

18     defendant informed the State Board of Accountancy that he

19     had "learned a great deal from this process."  And he

20     claimed that he was "focusing closely on accuracy,

21     diligence, and absolute candor with clients."

22           However, as a matter of fact, he was, instead of

23     reforming his ways, he had been actively defrauding

24     existing payroll clients, both before and after he made

25     those statements; in other words, while he was under a

1    probationary period.  His fraudulent conduct was in

2    violation of the rules of his probation, which included

3    that he not engage in further fraudulent activity.  He

4    disobeyed those rules and, therefore, he violated the

5    order.

6         Therefore, the Court finds that United States

7    Sentencing Guideline Section 2B1.1(b)(9)(C) 2-level

8    enhancement does apply and is not duplicative of the

9    abuse-of-trust enhancement of 3B1.3,

10   abuse-of-position-of-trust enhancement.

11        Do you wish to make any record for purposes of any

12   appeal, Mr. Lozow?

13        MR. LOZOW:  No, Your Honor.

14        THE COURT:  All right.  With respect to Objection

15   No. 5, the defendant objects to the recommendation,

16   because that is merely a recommendation.  So I understand

17   your position, but I don't think I have to address that.

18        The Government has filed a motion pursuant to

19   United States Sentencing Guideline Section 3E1.1(b),

20   requesting that this Court grant the defendant a full

21   3-level decrease in offense level for acceptance of

22   responsibility.  That motion, Document No. 31, is granted.

23        This results in a total offense level in this case

24   of 30.  The defendant's Criminal History Category is a I.

25   That results in an advisory guideline range of 97 to 121

1    months of imprisonment, not more than 3 years of

2    supervised release, and a fine in the range of $1,500 -- I

3    am sorry, $15,000 to $150,000.

4         And I think at this point, because I believe that

5    there are a number of victims that wish to make a

6    statement, I would like to hear from them before we

7    proceed any further.

8         So, Mr. Iley, if you would and Mr. Lozow would have

9    a seat.

10        At this point, I am going to open it up to any of

11   the victims who wish to come up and make a statement.  So

12   the protocol is, if you will come to the podium, speak

13   into the microphone, state your full name, and spell it

14   for the record, then you may make your statement.

15        And you can raise the podium so you don't have to

16   scrunch over.

17        VICTIM NEUMANN:  Good afternoon, Your Honor.  Harry

18   Neumann, N-E-U-M-A-N-N, and I am an owner of Western

19   Storage and Handling.  We were a client of Iley &

20   Associates for a period of 5, 6 years.

21        The reason I wanted to address the Court today was

22   Mr. Iley and his corporation stole from me and the

23   citizens of United States over $700,000.  And that

24   occurred over a period of about 5 years.

25        Over the past 20 months, I have been involved in a

1    number of hearings, as far as witnessing the hearings,

2    listening to Mr. Iley address questions.  Of course, prior

3    to his answering of any questions, he did hold up his hand

4    and swore to tell the truth, so help him God.

5        In almost all of those hearings, it was found that

6    he continues to tell lies.  If you look back through the

7    bankruptcy hearings, you will find that he misrepresented

8    himself in what had gone on during his scheme at his

9    company.

10        I think he really possesses a threat to the

11   citizens of the United States if he is not incarcerated,

12   and incarcerated for a long period of time.  With that, I

13   would like to thank you for your time this afternoon, and

14   ask the Judge to please impose the maximum sentence on

15   Mr. Iley.

16        THE COURT:  Thank you, Mr. Neumann.

17        VICTIM NEUMANN:  Thank you.

18        VICTIM DONOVAN:  Thank you, Your Honor.  My name is

19   Paul Donovan.  P-A-U-L.  Last name is Donovan,

20   D-O-N-O-V-A-N.  And I, too, am a victim of the Don Iley

21   scandal.

22        You know, I started my business with $2,500, and

23   hired him to take care of my payroll accounting and stuff

24   like that.  And basically he came after me for his

25   business.  I was solicited.  So not only was he stealing

1    clients, he was soliciting people to bring to him to steal

2    from.  So, like, he was aggressively going after people.

3          And, you know, I checked him out online.  He had

4    good reviews.  So I had no idea, you know.  And, you know,

5    like the guy before me, to give this guy a light sentence

6    is a slap in our faces.

7          I work 80 hours a week, and now I have to work 85.

8    So I'll sacrifice.

9          So, the IRS -- so I am at the point of having to

10   work paying back the IRS.  No deal.  They want every

11   single penny I owe them.  But then you are going to give

12   this guy a deal?  It doesn't make sense.

13         THE COURT:  All right.  Thank you, sir.

14         And that is what I understand also, is that the IRS

15   is not negotiating in any way with these people, and they

16   are having to pay twice, essentially.

17         MR. LARSON:  I think that is true, Your Honor.

18   With respect to at least some of these victims, there have

19   been offers and compromises that have been extended, and

20   the status of those, I think, is very much in play.

21         The fact is, though, I think for most people who

22   are sitting behind me, and for many of these victims, the

23   IRS did seek the taxes to be paid, and initially requested

24   interest and penalties.

25         Some of that interest and the penalties have been

1    paid.  Some negotiations have gone on with respect to

2    various numbers of these victims, where there is an offer

3    and compromise for some amount that may be less than those

4    interests and penalties.

5        And I understand there may be some negotiation that

6    would reduce the principal that would have been owed.

7    But, for these victims, what has happened is that over the

8    course of many months, if not years, money has been

9    withdrawn from their bank accounts, and they were acting

10   in good faith, believing that their payroll taxes were

11   being paid.

12       THE COURT:  Exactly.  And that is what -- and I

13   guess it is not my business, I guess, but I am kind of

14   wondering why the IRS is -- I can understand them wanting

15   to pursue collection, but penalties and interest that

16   double the amount of what is due.  It seems like the

17   Government should be helping out these people, not going

18   after them to try to make up moneys from them.

19       I just don't understand why the IRS is doing that.

20   I can understand for somebody who fraudulently, on their

21   own, didn't pay the Government.  But when they are

22   innocent victims, why are we doing this?

23       MR. LARSON:  The prosecutor's table shares your

24   view, Your Honor.  And, if I could just speak for a moment

25   about the special agent that is sitting next to me.  He

1    works for IRS CI, which is the criminal side of the

2    Internal Revenue Service.

3            And my understanding, it is not the criminal side

4    at all that is pursuing this action -- these actions

5    against these individual taxpayers, but it is, rather,

6    another part of the Internal Revenue Service that is

7    engaging in that activity, as unfortunate as it is.

8            THE COURT:  And my understanding is an offer and

9    compromise is only made to people who have nothing to pay

10   anyway, and you have to essentially liquidate everything

11   you have before they will give you that.  So, the

12   majority, from what I read from the victim impact

13   statements, is that these are honest, law-abiding people

14   who are doing everything they can now, having to work

15   extra hours, go down and sell their homes, invade their

16   retirement accounts, not be able to retire, to try to make

17   it.

18           And it just seems to me wrong for the Government to

19   say, oh, and you owe us penalties and interest on that.

20   It is not their fault.  I think our legislators need to

21   take a look at this.  And I think you all may need to

22   write your legislatures and say, can't you pass something

23   that says in a case like this, when we were innocent

24   victims, too, the IRS shouldn't being going after them for

25   penalties and interest.

1          My soapbox.  I am not going to get into politics,

2     but it just didn't seem right to me.

3          I am sorry, sir, you may proceed.

4          VICTIM KING:  Hi.  My name is John King, and I own

5     a store in Park Hill called Great Expectations.  And I

6     have worked with Don since 1999.  And I can't understand

7     why he did this.  And I really thought that you were my

8     friend.  And I just don't understand.

9          I would like to address for a second what you just

10    said about the IRS.  They didn't even know that all these

11    taxes were owed; it took us to let them know.  I have

12    paperwork indicating that all of my taxes were paid, just

13    as they should have been.

14         And, so, for them to come and -- come back to me to

15    get the money is just beyond belief.  So, I'm not sure

16    what is going to happen, but it has been a terrific mess,

17    and it is not over yet by a long shot.

18         THE COURT:  All right.  Thank you.

19         VICTIM KING:  Thanks.

20         VICTIM CSEAK:  Good afternoon, Your Honor, my name

21    is Richard W. Cseak, Jr.  I own a company called Seniors

22    Rock, Inc., doing business as Home Helpers Senior Care.

23         Originally, I wasn't going to come here.  I, too,

24    met Don.  I was approached in 2009.  And, as I started my

25    first client -- we take care of the most frail people in

1    the world.  I take care of seniors that are trying to stay

2    at home, independent, and they put their trust in me, as I

3    did with Mr. Iley.

4         And originally I wasn't going to come today, but I

5    felt if I didn't -- first off, I had to protect my

6    employees, my company, what I do.  But, what I really want

7    to speak about were the people I take care of.  And as an

8    owner of a business that takes care of seniors, if I did

9    anything wrong -- I'm under the Department of Health -- I

10   would have to pay the worse consequences.

11        And I feel, Don, that you not only hurt me and my

12   company, my employees, but you also engaged my clients in

13   this.  So today I want to speak about that.  I, too,

14   believe Don deserves the maximum sentence that he could

15   receive.

16        And thank you for letting me speak today.

17        THE COURT:  All right.  Thank you.

18        VICTIM MERRIAM:  Good afternoon, Your Honor.  My

19   name is Ted Merriam, M-E-R-R-I-A-M, a tax attorney in

20   Denver.  I represent four of Iley's victims.  And I just

21   want to try to put a human element to this.

22        Just like the previous speakers, my clients were

23   all small business people fully trusting Mr. Iley.  And it

24   was a slick scam.  They gave him access to their bank

25   accounts in order so that he could make the tax deposits

1    directly.

2            This went on for years.  And the way he was able to

3    not get caught by his clients is he would send them a pro

4    forma form 941, employment tax return every quarter, that

5    was entirely accurate.  It corresponded to the penny with

6    the money that he had withdrawn from their bank accounts.

7            He, I believe, must have known that if he would

8    have filed those with the IRS, the IRS would have been

9    alerted that there is a big non-payment.  So, what he did

10   is, at the same time he is sending the clients a

11   perfect-looking legitimate tax return, he was filing a

12   return with the IRS that showed zero; zero wages, zero

13   withholding.

14           So I've got to believe that he must have known that

15   that would hopefully not raise an IRS red flag that

16   anything was wrong.  Because, according to the filings

17   with the IRS, all of the taxes were paid, because there

18   were none.

19           He got away with this for years.  And having

20   represented clients in front of the IRS for many years,

21   the response of the IRS bureaucracy is atrocious.  Number

22   one, the fact that they could let this go undetected for

23   so many years, somebody at the IRS -- and it is not one

24   person as we all know -- was asleep at the switch.

25           So now that it has all been discovered and

1    everybody is working with the IRS to decide what the

2    proper amount of tax was.  Well, the IRS just takes the

3    position that the business owners are liable for those

4    taxes.  Legally it is called a non-delegable duty; you

5    can't blame your preparer.

6        And so in the IRS world, they have, in my

7    experience with my clients, not assessed any penalties,

8    but they are insistent that the clients are responsible

9    for the unpaid taxes, which I believe one gentleman said

10   he is in for over $700,000.  It will just break these

11   people.

12       And it is a shame that the CI, on one hand, seems

13   to feel sorry or sympathetic for the victims but, as the

14   perfect bureaucracy operates, it is not CI's job to

15   collect any employment taxes.  So you have got this

16   faceless bureaucracy, where everybody is passing the buck.

17       When we go to public hearings or private meetings

18   with the IRS, they say all of the right things; we are

19   going to work with you.  But, of course, they don't.  And

20   their proposal to all these taxpayers is, submit this

21   so-called offering compromise.

22       Well, what the IRS is looking for in the compromise

23   is that they will waive the penalties and interest, but

24   not the tax.

25       THE COURT:  Apparently they won't even waive the

1    penalty and interest for some of the folks, because I have

2    victim impact statements that say it is doubled for me

3    now.

4         VICTIM MERRIAM:  Well, that is what I've heard,

5    Your Honor.  Fortunately, my clients, nobody has been hit

6    with the penalties.

7         But, anyway, it is just a horrible, you know,

8    situation, of course, that honest taxpayers, that can't

9    count on the IRS to be competent, you know, for this

10   scheme to go undetected for so long, yet now that it has

11   been detected, to have such a heartless approach to these

12   clients.  And so many of them were doing just fine until

13   Iley stole them blind.

14        And, you know, I'm not particularly a vengeful

15   person, I don't think.  But, in this case, he has ruined

16   so many lives, that I just hope the Court takes that into

17   consideration when it imposes sentence.

18        THE COURT:  All right.  Thank you very much.

19        VICTIM MOSKOWITZ:  My name is James Moskowitz.  And

20   I would like to share with the Court, based on what my

21   attorney just said a few minutes ago, that our attorney is

22   representing us with the IRS trying to work out the

23   penalties and fines.

24        But, as a Medicaid provider, providing care, as the

25   gentleman who spoke two people before me, to be

1    performing-- providing home health to Medicaid

2    individuals, the most poor, indigent people out there, it

3    was all Medicaid, not private pay, we are still suffering

4    the consequence as trying to negotiate with the IRS, where

5    the Federal Government's recruitment of dollars, because

6    every so often, the CMS says, oh, there is money owed

7    back, they take money back from us, and our attorney keeps

8    trying to get it back from them.

9         So not only myself am I paying the consequences of

10   what he caused to the people I serve and the employees I

11   serve but, in addition, on a bi-monthly basis he took

12   money owed, and it constantly happened.  So now I am

13   trying to fund the agency to keep it alive while we try

14   settle this with IRS.

15        But this gentleman over here knowingly stole

16   hundreds of thousands of dollars.  In our situation, it

17   was $600,000 from our company, that provides care in

18   Denver and Colorado Springs.

19        So I would ask that the Judge consider that for the

20   hundreds of people he caused harm to and the hundreds of

21   employees that worked for my agencies, that he destroyed

22   their lives.  Thank you very much.

23        THE COURT:  Could you spell your name, please.

24        VICTIM MOSKOWITZ:  J-A-Y.  Last name is

25   M-O-S-K-O-W-I-T-Z.

1          THE COURT:  Thank you.

2          VICTIM SNOWDEN:  Hello, my name is Curtis Snowden,

3    C-U-R-T-I-S S-N-O-W-D-E-N.  I am an employee with Reality

4    Technology.  I am here on behalf of my boss and friend,

5    Ivan Drinks, Jr., who couldn't make it, who is the owner

6    of the company.

7          You know, speaking from a personal level on this,

8    because of all of the financial trouble that we have had

9    caused by all of this, I was effectively unemployed for 3

10   months last year, because the company just was not able to

11   afford my salary anymore, which, in all honesty, I wasn't

12   making that much, so that is how hard we were hit.

13         It's taken me up until about April of this year

14   just for my finances to get back in line after being

15   rehired back in November of 2016.

16         I mean, I am really hoping that with everybody

17   else's statement about this, it is really coming clear how

18   much this has hurt and devastated us.  I mean, if Mr. Iley

19   had mugged me in the street, I would be out just whatever

20   was in my wallet at that point, and just have a story to

21   tell.

22         But, as it stands now, the company is still trying

23   to recover and put everything back together.  And I was

24   really happy to hear all of the talk from everybody else

25   as regards the IRS, because we are left wondering how

1   really was this able to happen.  How did it go on for so

2   long?

3          And, especially from my perspective, as an employee

4   of the company, where I filed my income taxes every single

5   year, and I have for as long as I worked there; about 10

6   years now, and the payroll taxes being sent in were at a

7   zero.  Isn't that just an immediate red flag?  How could

8   it have ever gone on for more than a minute?

9          It is something that we still haven't gotten the

10  answers on, and we're still really curious at this point.

11  So, thank you.

12         THE COURT:  Thank you, sir.

13         VICTIM HINNEN:  Good afternoon, Your Honor, my name

14  is Susan Hinnen, H-I-N-N-E-N.  And, like so many who have

15  spoken before me, we're a small business.  We were with

16  Don since 1997.  He solicited our business.  We were

17  grateful to have found somebody that took our small

18  business and communicated with us in the way that we knew,

19  we trusted.

20         And there isn't anything else I can say on top of

21  what other people have already said, other than we trusted

22  you, Don.  And we have lost our business; the small

23  business that my husband and I built 25 years ago.

24         So, I, too, hope that you will take into

25  consideration all of the small businesses; the people that

 1    help other people.  The people that have employees that

 2    are now still responsible for this money that they have

 3    already paid.  We have already paid, and now have to

 4    figure out how we are going to pay it again, as unfair as

 5    that is.

 6         I just cannot even imagine what you thought when

 7    you were doing this to all of these clients of yours.

 8         Thank you, Your Honor.

 9         THE COURT:  Thank you.

10         VICTIM ADELMAN:  Steven Adelman, A-D-E-L-M-A-N.  I

11    just want to add on more one thing to this, which is

12    Social Security.  I was actually at the Social Security

13    office last week, trying to get things corrected.  By

14    zeros being turned in, when you get your Social Security

15    statement for 2012, '13, '14, '15, for me shows zero,

16    which totally affects what you are going to get from

17    Social Security; getting that corrected.  Don't know how I

18    am going to be able to.

19         It is a big issue.  And I have no idea what is

20    going to happen with that.  So, you got me for about 400K

21    almost.  Hopefully he is going away to prison.  He

22    deserves to.  And I really hope he gets the maximum.

23    Thank you.

24         THE COURT:  Thank you, sir.

25         VICTIM DORENKAMP:  Thank you, Your Honor.  Dan

1    Dorenkamp, D-O-R-E-N-K-A-M-P.  Just one thing I want to

2    add.  I was a victim, as well.  But one thing I want to

3    bring to the Court's attention is I was a client from 2011

4    to 2015.  And in 2013 or '14, late '13 early '14, I

5    received a phone call from a lady asking if I was looking

6    for payroll services, and I said I was happy with the

7    company I was using, which was Mr. Iley, and she said,

8    well, she was from Mr. Iley's office.  And I said, well,

9    maybe, you should look at your records, I am already a

10   client.  And she said, well, we are out looking for more

11   clients all of the time for payroll services.

12        So I don't know what Mr. Iley was doing at this

13   time, if he was looking for more victims, that is what I

14   have to assume.  So it just sickens me that he was

15   victimizing all of the clients he already had, and he was

16   out searching for more clients.

17        I don't know what you were thinking, Don, and it

18   just sickens me to even look at you today.

19        Thank you, Your Honor.

20        THE COURT:  Thank you.

21        Anybody else?

22        VICTIM SAIS:  My name is Anna Sais, S-A-I-S.  We

23   were approached by a lady in regards to soliciting our

24   business in 2014.  And we were reluctant, but everything

25   panned out.  I looked on the website.  I checked him out,

1    to make sure, and he looked liked he had a really

2    reputable company.  So, I said, let's do it.

3         And everything was like they said.  They sent over

4    the tax forms.  Everything showed that everything was

5    legitimate.  So we didn't question anything.  And then to

6    find out all that stuff was taken.  And to call the IRS --

7    and, of course, we had penalties and all that fun stuff

8    that they decided to put on us.

9         I do hope that you press the maximum penalty on

10   him, because he did this for a long time for a lot of

11   people, and it's not right.  Thank you.

12        THE COURT:  Thank you.

13        Anybody else?

14        VICTIM LIESEGANG:  Your Honor, Alex Liesegang.

15        THE COURT:  Could you spell your last name.

16        VICTIM LIESEGANG:  It's a tough one, Liesegang,

17   L-I-E-S-E-G-A-N-G.  I am not going to touch on some

18   points, because most of these fine gentlemen and women

19   have already said the impact that it had.

20        For me, the impact is, you know, it kind of

21   resonates like a Bernie Madoff, but he took money from

22   people who actually had it.  Don did my taxes for 15

23   years, and he knows I would never be able to pay this

24   debt.

25        So we are sitting here today, trying to figure it

1    out with the IRS, who you can't get a call back from.  I

2    have had to refinance my business.  I have got two kids,

3    whose college education is based on real estate and my

4    business, and which I've paid for his kids to go to

5    school.

6        And I'm not trying to be funny when I say this, but

7    if you give me $9.8 million free and clear, put me in jail

8    today, I would do it for 7 years.  Thank you, ma'am.

9        THE COURT:  Thank you, sir.

10       Anybody else?

11       VICTIM VAN DYKE:  Good afternoon, Your Honor.  My

12   name is Joe Van Dyke.  Last name is V-A-N D-Y-K-E.  I

13   really feel sorry for a lot of people here, because they

14   got hit a lot harder than I did.  But I haven't heard

15   anybody talk about what this did to relationships, and the

16   stress it caused at home.

17       That alone is worth, I don't know how much.  But I

18   can guarantee everybody behind me has dealt with problems

19   in their relationships with their wives and their kids,

20   maybe other relationships because of this and because of

21   the stress it caused.

22       So, not only did he ruin people financially, I have

23   got to believe that he ruined some relationships, too.  I

24   just don't know if it was worth it.  How he was going to

25   benefit.  How he was going to benefit his relationships

1    with what he was going to do with the money, when he

2    ruined so many other relationships.

3          Your Honor, that is all I have to say.  Thank you.

4          THE COURT:  All right.  Thank you.

5          VICTIM ROBERTS:  Gail Roberts.  And I didn't think

6    I would be able to come up here and do this, because I've

7    had health issues for years.  And it was such a relief to

8    have him come in and say that I wouldn't have to worry

9    about it, that he would take care of everything.  He

10   really took care of everything.

11          The stress level, it was just insane.  How could

12   you look at us in the face, make calls, commit to us that

13   you are taking care of us.  It's super stressful.  Super

14   stressful.  And my health can't do it.  I have been

15   hospitalized.  I have had other issues on top of it.

16          And I am just listening to all of these people.

17   And I didn't think I could come up here and do it.  But I

18   don't understand how you could lie, cheat, and steal from

19   all of us.

20          You preyed on small businesses.  And it is super

21   disappointing.  I hope he gets the most you can give to

22   him.  Thank you.

23          THE COURT:  Thank you.

24          Anybody else?

25          All right.  Mr. Lozow, would you and Mr. Iley

1    please approach the podium.

2        MR. LOZOW:  You want the client up here?

3        THE COURT:  Yes, please.

4        I normally tell you how I am intending to go.  I

5    will go through it, but I can honestly tell you, I am not

6    really sure, and my computer has just frozen, so I have to

7    wait.  Okay.  So I will do what I normally do, which is

8    just to let you know, because this is probably your first

9    time in a sentencing like this.

10        Normally judges don't tell people what they are

11    thinking.  I think it is important to tell them so they

12    can target whatever argument they want to make to me

13    before I actually impose a sentence, so that is how I am

14    going to proceed, because that is how I've proceeded in

15    every case in the last several years.

16        So, as part of my protocol for determining whether

17    the advisory guideline range is a range that is

18    sufficient, but not greater than necessary, sentence --

19    and that is the standard I have to impose; sufficient, but

20    not greater than necessary, to achieve the objectives of

21    sentencing.  I have reviewed this presentence report.  I

22    have considered the sentencing guidelines.  And I have

23    considered the factors that are set forth in Section 18

24    United States Code Section 3553.

25        There were no requests for downward departure or

1    requests for a variant sentence in this case.  In his

2    sentencing statement, the defendant does argue for a

3    sentence at the bottom of the advisory guideline range.

4    And, as I stated earlier, the guideline range is 97 to 121

5    months.

6         He argues that he has no criminal record.  He

7    argues his status and his age.  And he indicates that a

8    lengthy incarceration, at the bottom of that guideline,

9    does assure that he will not have the opportunity nor the

10   state of mind to commit further crimes when he is

11   released.

12        The probation office recommends a guideline at the

13   higher end of the advisory guideline range due to the

14   nature and circumstances of this offense.  Mr. Iley's

15   victims entrusted him to assist and guide them with their

16   numerous financial obligations, and he took advantage of

17   that trust that was placed in him to enrich himself to a

18   degree that is not normally seen, and to me was just total

19   -- it wasn't necessary, other than to lead a lavish

20   lifestyle that you didn't earn.

21        From the victim impact statements that are written,

22   and what was spoken here today, this isn't a fraud where

23   he just lied to people and took their money, he actually

24   stole the money from their accounts.  They trusted him.

25   They gave him access to their bank accounts so he could

 1    pay payroll and other tax obligations.

 2         He went in, took the money, and instead of paying

 3    the taxes, he put the money in his own pockets.  And then

 4    he filed false income tax records so that he wouldn't get

 5    caught and his clients wouldn't realize that he hadn't

 6    been paying the taxes for them.

 7         Many of his clients had to close their businesses.

 8    They became insolvent.  Had to dig into their savings or

 9    retirement accounts to pay the IRS taxes that they

10    believed had been paid, and the money had been taken from

11    their account, so they are paying twice.

12         They had to make substantial changes to their

13    living arrangements, including downsizing their homes,

14    being unable to retire when they had planned.  Some of the

15    victims suffered health problems as a result of the

16    stress.  Some remain paying towards those unpaid taxes

17    while attempting to keep the businesses running.  And, as

18    indicated today, relationships suffered because that type

19    of financial stress just can destroy a family.

20         I am going to quote from a few of the victim impact

21    statements that really kind of hit home.  "Don's choice to

22    steal from us took a tremendous toll on our relationship.

23    The money we had been paying the IRS was to be a portion

24    of our salary.  As a result, we could not make payroll and

25    could not pay ourselves our salary.  My brother ended up

1    having to sell his home.  He quit the family business and

2    moved away.  We have not spoken since.  Now I am left

3    alone to care for my elderly parents, causing strain in my

4    marriage.  Physically, I am a wreck.  I cannot sleep.  And

5    my health is deteriorating."

6         "It was difficult to focus on my business.  I lost

7    sleep from all of the stress and worry.  Many days I was

8    so distracted that I had to go home sick.  I was

9    depressed, angry, and oftentimes numb from disbelief.

10        Further, I still have nightmares regularly and I

11   believe will not rest peacefully until this is resolved.

12   I have suffered chest pain, multiple panic attacks,

13   nausea, headaches, and severe depression.  My quality of

14   life has been extremely compromised."

15        And this victim also indicates that she may have to

16   close her business as a result of the defendant's conduct.

17        Another victim wrote, "Even when everything was

18   coming to a close during the fourth quarter of 2015, J,

19   one of the victims, called to see what was going on.  When

20   Don Iley knew that he had been caught with his hand in the

21   cookie jar, so to speak, Don answered the phone and did

22   our payroll one more time.

23        It feels like there was really a lack of conscience

24   or portrays one who maybe views themselves as beyond

25   reproach.  We believe that what has been most frustrating,

1    hurtful, anger provoking, is the loss of the precious time

2    this has caused, having so much more to wade through and

3    figure out.  Time away from our daughters, who albeit are

4    young adults, still enjoy time with their parents.

5         The bitter pill to swallow is the time it has

6    robbed from Eve, that is the wife's, aging parent.  She is

7    the only child living close to them.  Her mother is the

8    sole caretaker for her father, who suffers from dementia.

9    But the time demands of additional work to remedy this

10   situation, and taking on additional hours for financial

11   reasons, has not allowed her to spend the time with her

12   dad as he rapidly slips away or to offer her mom the break

13   she needs and deserves."

14        So, the cost of this offense, both financially and

15   emotionally to these victims, is great.  And, as was

16   testified to here today, will impact their lives for an

17   indefinite amount of time going forward.

18        Although, now that he has been caught, Mr. Iley

19   expresses, at least in writing to me, remorse for his

20   actions.  At the time he was stealing from his victims, it

21   was not because he needed to.  He was living a lavish

22   lifestyle with moneys he stole from his hardworking

23   clients.

24        He was living in a multi-million dollar home,

25   traveling with his family, paying for his children's

1    college and private school tuition, attending football

2    games in box seats, enjoying shows, and spending the

3    victims' money with no apparent remorse at the time.

4         With respect to his history and characteristics, on

5    the surface he appears to be a family man, a churchgoing

6    and law-abiding citizen.  But, as one of his victims put

7    it, "Don Iley was always so nice and also a client of my

8    tree care company.  It is his intentional deception that

9    angers me so much.  He put on a facade, and meanwhile he

10   was stealing from me the whole time."

11        This same victim stated, "I now owe the IRS $1,066

12   per month for 3 years.  This payment is huge for me and

13   will hinder the growth of my business.  With this money I

14   could have bought new equipment and hired a few more

15   workers.  Now I have this payment to repay taxes that I

16   have already paid but were knowingly stolen by Don Iley.

17        The Federal Government has never reached out to me

18   personally to ask how this crime has impacted me and my

19   business.  The IRS is not willing to work with me at all

20   on the money I have to repay them.  But the IRS is willing

21   to make a deal with a criminal such as Don Iley, who has

22   wrecked a lot of lives.  This makes me extremely angry at

23   the system.  I am being penalized for Don Iley's criminal

24   activity, and that is unfair and unjust."

25        From the victims' impact statements, both in

1    writing and what I have heard here today, it is clear to

2    me that you all didn't just accidentally cross paths with

3    Mr. Iley.  He actually sought out his victims, and he

4    focused, apparently, on small businesses, whom he knew he

5    could snow over more.  He recruited them.  He became

6    friends with them.  He even, apparently, had staff members

7    search for new clients for him.

8            His victims thought he was a friend, and he

9    betrayed them.  Not only did he ruin them financially, he

10   ruined the health and relationships of many of these

11   people.  He put them out of business.  And, as was

12   testified to here today, it wasn't just them that he

13   impacted, it was the clients they served; whether they

14   were old or needed help with their healthcare or whether

15   they were children.  It is kind of like the ripple effect.

16           And he didn't steel from them only once.  His

17   fraudulent conduct included filing false reports to the

18   IRS showing no income so that he wouldn't get caught, and

19   now that is coming back to haunt them in their retirement,

20   their Social Security payments, and having to repay the

21   taxes that were never paid.

22           As evidenced by his prior sanctions from the

23   Accountancy Board, this conduct is not the first time he

24   has been engaged in fraudulent behavior.  He was placed on

25   a probationary period for 5 years by the Accountancy Board

1    due to complaints from at least five individuals.

2         So his conduct in this case is not aberrant

3    behavior for him.  Rather, this Court is concerned that it

4    is reflective of an ongoing pattern of behavior.  As such,

5    this Court believes that there is an ongoing need to

6    protect the public from further crimes of this defendant;

7    to promote respect for the law, when he goes in and he

8    lies to them and tells them he has seen the light and the

9    error of his ways, while he is all of the time still

10   defrauding people; to afford adequate deterrence, not just

11   to him for his conduct, but for others who may be

12   considering to engage in this type of behavior.

13        And, frankly, the Court finds it really hard to

14   fathom how one person or one family could dispose of

15   almost $10 million, no matter how lavish a lifestyle they

16   are living.  Yet, the money seems to be nowhere to be

17   found.

18        This Court is disturbed by the fact that the

19   defendant has not been forthcoming and honest about his

20   financial situation.  The probation office indicates that

21   it has asked the defendant numerous times throughout the

22   presentence investigation period to provide documentation

23   of financial condition.

24        And while Mr. Iley is apparently a very smooth

25   talker and verbalized that he is very willing to provide

```
 1    the documents and the information requested, the probation
 2    office indicates that he has been only minimally
 3    responsive to those requests.
 4         The probation officer provided the defendant with a
 5    financial affidavit to complete for purposes of the
 6    presentence report.  The first copy of the affidavit was
 7    returned not fully completed.  He was instructed to fill
 8    it out completely and accurately and return it.  He
 9    returned the affidavit, but it was not very much different
10    from what was originally submitted.
11         Apparently, in his bankruptcy proceedings, it was
12    determined that he made a $900,000 payment on his mortgage
13    within 18-months of the bankruptcy proceeding.  The
14    bankruptcy trustee believes that money was obtained
15    through this fraud.
16         And, finally, this Court believes that the
17    sentencing guidelines are quite lax when it comes to white
18    collar criminals like Mr. Iley.  One of the victims today
19    mentioned, you know, if he had mugged him on the street.
20    Well, if I had a young, uneducated person who had mugged
21    you on the street, they would be facing, even if they got
22    very little, they would be facing years in prison.  Yet,
23    with while collar criminals, who not impact just one
24    person, but hundreds of people, for millions of dollars,
25    it is often a slap on the wrist.
```

1    So, my view is that the sentencing guidelines are

2    very lax when it comes to white collar crime, basically

3    because those crimes are committed by educated people.

4    And, in this case, we are talking millions of dollars and

5    142 known victims.

6    So, based on my review of this case, and after

7    consideration of the 3553(a) factors, I am inclined to

8    upward vary beyond the recommended sentence of 97 to 121

9    months, and impose a sentence of 180 months as to Count

10   12, a term of 36 months as to Count 8, to run concurrently

11   to one another, supervised release for a term of 3 years

12   as to Count 12, and a term of 1 year as for Count 28, to

13   run concurrently.  I am sorry, did I say Count 8?  Count

14   28, to run concurrently to each other.  And restitution in

15   the amount of $9,718,327.68.

16   I would have liked to have put interest on that

17   amount, but we don't have enough information for me to be

18   able to make the determination that he is financially able

19   to pay the interest.  So I will not impose a fine, and I

20   will not -- because I want him to pay restitution not a

21   fine.  And I will not impose interest on the restitution.

22   So, that is my inclination, Mr. Lozow.  You can

23   make any argument you wish to persuade me otherwise or for

24   the record on appeal.  Then I will hear from Mr. Larson.

25   And, finally, Mr. Iley, if you wishes to make any

1    statement to me on your own behalf, I will hear from you.

2         MR. LOZOW:  Judge, first, let me suggest that I

3    think the Court's upward variance, if that is what

4    happens, may be in contravention of the Criminal Rule 32;

5    notice to the defendant.

6         THE COURT:  I think the Rule 32 applies to

7    departures.  I don't believe it applies to variances.

8         MR. LOZOW:  I understand.  Let me just cite for the

9    Court --

10         THE COURT:  And if that is going to be an

11    objection, I will continue this hearing.  I will give you

12    the notice, and we will come back, because that is what I

13    think is just in this case.

14         MR. LOZOW:  I understand.  I would like to at least

15    confer with my client with regard to that before we finish

16    this hearing, Judge.

17         THE COURT:  You may.  Well, let's go ahead.  And if

18    you are going to object, let's go ahead -- do you want to

19    take a break to talk to him?

20         MR. LOZOW:  If the Court wants to give me a minute

21    or two, please, I would appreciate it.

22         THE COURT:  We will go ahead and break for 5

23    minutes, and then I will be back then.

24         (A break is taken from 2:56 p.m. to 3:05 p.m.)

25         THE COURT:  You may be seated.

1          All right.  Mr. Lozow, I did, while I was out, look

2     at the case that I was relying on, Irizarry v. United

3     States, 553 U.S. 708, which essentially says that since

4     the guidelines have become advisory, Burns, and Rule

5     32(h), which was promulgated in response to Burns, no

6     longer apply, and that there is no requirement to give

7     notice for an upward variance.

8          MR. LOZOW:  Your Honor, I am familiar with that

9     case.  I would also cite to the Court U.S. v. Redmond,

10    which is found at -- the cross citation I have of 388

11    Fed --

12         THE COURT:  388?

13         MR. LOZOW:  388 Fed. Appx 849, 2010.  It is a 2010

14    case, which came out after Irizarry.

15         THE COURT:  By whom?

16         MR. LOZOW:  The Tenth Circuit.

17         THE COURT:  What does it say?

18         MR. LOZOW:  I can read from the quote, Judge.  And

19    consistent with the Court's offer to me, I talked to

20    Mr. Iley, and we would like a continuance to kind of

21    respond to the Court's decision.

22         THE COURT:  Well, I was only going to grant a

23    continuance if there was any doubt as to whether I could

24    upward vary.  So I am not interested in a continuance at

25    this time, and I think we can proceed.

1          MR. LOZOW:  Well, let me cite, then -- do you want

2      me to cite the case?

3          THE COURT:  Yes, please.

4          MR. LOZOW:  It says in <u>Redmond</u> that, "Sound

5      practice dictates that judges in all cases should make

6      sure that the information provided to the parties in

7      advance of the hearing, and in the hearing itself, has

8      given them an adequate opportunity to confront and debate

9      the relevant issues.  We recognize that there will be some

10     cases in which the factual basis for a particular sentence

11     will come as a surprise to a defendant or the Government.

12     The more appropriate response to such a problem is not to

13     extend the reach of Rule 32(h), but rather for a district

14     judge to consider granting a continuance when a party has

15     a legitimate basis for claiming that the surprise was

16     prejudicial."

17         THE COURT:  And how is this prejudicial or

18     surprising?

19         MR. LOZOW:  Well, I will tell you why it is, Judge.

20     Because, number one, the presentence report and the

21     probation department that recommended 110 months,

22     indicated that they saw no grounds for variance or

23     departure.  And the Government took the same position,

24     stating that they saw no grounds for a variance or

25     departure.

1          Those were the presentence reports and documents

2     that we see, which took into account, obviously, the same

3     victim statements, and I think some of the same people who

4     had put those in the record or testified today, had

5     provided statements.

6          I will tell you that I don't think it does any good

7     for the Court to hear about experience or a lawyer's

8     experience, but this decision in the last analysis is 82

9     months higher than the Government's recommended sentence,

10    and 70 months higher than the probation department's

11    recommended sentence.  I am surprised.

12          THE COURT:  Well, it is only 5 years higher than

13    the top of the advisory guideline.

14          MR. LOZOW:  Pardon me?

15          THE COURT:  It is only 5 years higher than the top

16    of the advisory guideline sentence, and it is within the

17    sentencing range that is allowed by law.

18          MR. LOZOW:  Well, I don't disagree, but it is

19    actually rather a substantial variance, in terms of what I

20    had notice of and what the Government and the probation

21    department had suggested in its paperwork.

22          Likewise -- I am not asking for a lengthy period of

23    time, but the Court made some findings with regard to its

24    thoughts about going forward, and I think it necessitates

25    me spending -- I didn't -- it wasn't my --

1              THE COURT:  Well, most of the time, Mr. Lozow, you

2     wouldn't even get the benefits of my thoughts until after

3     I had sentenced him.  That is how most of the judges do it

4     in this courthouse.  So I do it as a courtesy so that you

5     can then respond.  But you knew what his behavior was in

6     this case.  You knew what his conduct was.

7              So I don't understand how could you have been

8     caught off guard.  And you know me.  I am hard on white

9     collar criminals.

10             MR. LOZOW:  Judge, I don't think that I make it a

11    premise of mine to think that no matter what a Court's

12    philosophy is, that based upon recommendations both by the

13    Government and the probation department, that I don't

14    react to that in some way that kind of talks about my

15    preparation for this hearing.

16             I'm unprepared to answer some of the comments that

17    the Court made in its projected findings.

18             THE COURT:  Such as?

19             MR. LOZOW:  Well, things like there is $10 million

20    that is missing.  And things like he lied to the probation

21    department.  And some of the issues about --

22             THE COURT:  I didn't say he lied to the probation

23    department.  I said he was not forthcoming to the

24    probation department.  That is in the report.  And there

25    is 9.7 million that is missing.

1          MR. LOZOW:  Again, the parties have agreed to kind

2     of submit that to the Court.  And there is no dispute

3     about that, and there never has been.  As a matter of

4     fact, we spent months and months getting to that number.

5          But we are talking about an extra 5 years of a

6     man's life outside the advisory guideline with regard to

7     the case, seems to me that I should have the opportunity

8     to kind of respond, in whatever fashion the Court brought

9     it to our attention.  I appreciate the Court signalling

10    it.  Because, to be candid with the Court, I'm taken

11    aback.  I think there are things I can bring to your

12    attention, but I need some time to do that.

13         THE COURT:  Such as?

14         MR. LOZOW:  There is a bankruptcy here.  There was

15    an aggressive day in, day out issue with regard to a very,

16    very aggressive trustee.  There is some issue with regard

17    to kind of what we tried to do with the IRS.

18         THE COURT:  And what does that have to do with my

19    sentencing?

20         MR. LOZOW:  Well, again, you are varying, with

21    regard to the comments you made, based upon your

22    prediction to us about what you are going to do.

23         THE COURT:  I don't understand.  I am varying as to

24    the comments that were made?

25         MR. LOZOW:  No, no.

1          THE COURT:  That was in this the report.  The

2    report cited the bankruptcy.  That is where I took that

3    from.  You are well aware of that.  So I just need to

4    know, if you want a continuance, you are going to have to

5    do more to justify it, because I am not going to continue

6    the hearing unless you can show there was somehow some

7    real prejudice to your client.

8          MR. LOZOW:  It may be that my dependency upon both

9    the Government and the probation department's statements

10   that there is no grounds for departure or variance.  Now,

11   the Court has had this information, for the most part, for

12   a lengthy period of time.

13         THE COURT:  As have you.

14         MR. LOZOW:  Well, I have had it since about July.

15         THE COURT:  You've had it before I had it.

16         MR. LOZOW:  Well, I am assuming the Court has read

17   it, like I read it, within the last week or two.  As time

18   has gone on, we have seen corrections.  In fact, one of

19   the supplemental reports by the probation department came

20   to us within probably the last week.  Now, remember, I

21   asked for some time because of other issues that I had in

22   my practice.

23         THE COURT:  And I granted that.

24         MR. LOZOW:  But, I do think -- I do think, when you

25   are talking 5 years of a man's life --

1          THE COURT:  Well, I will tell you this.  If you

2     want a continuance, I am willing to grant a continuance,

3     but I am going to remand Mr. Iley.

4          MR. LOZOW:  Well, I think that still may be a

5     necessity.  Let me talk to Mr. Iley.  I am not quite sure.

6          THE COURT:  Well, if you want to continue, I am not

7     going to let him go free when there is 9.7 million that I

8     don't know where it is at, and the possibility that he

9     could abscond, knowing that this is what he is looking at

10    as a sentence.

11         So, if you want a continuance before I impose

12    sentence, I will do that, but I am going to remand him.

13         MR. LOZOW:  I will ask him that question if that is

14    what he wants.  The Court will also take note, I am

15    assuming, of both the recommendation of the probation

16    department and the Government concerning voluntary

17    surrender.

18         THE COURT:  I saw that, and I disagree with it.

19    And I have been burned before by defendants who, knowing

20    they are going to have a lengthy period of time,

21    absconding when there are assets that we could not account

22    for, and they have been able to take off to foreign

23    countries and have to be extradited back.  I am not going

24    to take that risk in this case.

25         MR. LOZOW:  Judge, I would suggest to you that this

1    family has moved to Kansas, and has obviously notified

2    everyone of their move.

3         THE COURT:  That was exactly what happened in the

4    other cases.  They were to the tee.  They were on a foot

5    monitor -- a leg monitor, cut it off, took off.  First

6    time they violated.  I am not taking a chance again.

7         MR. LOZOW:  I understand what the Court is saying.

8    But let me just suggest to the Court that if the Court had

9    simply sentenced consistent with the top of the

10   guideline -- Mr. Iley knew he was coming to court today to

11   face about a 10-years sentence.  He came with his wife and

12   children.  We decided not to bring the children into the

13   courtroom.  So to suggest that he would somehow abscond or

14   take a different position in this case --

15        THE COURT:  I don't know if he will.  I am not

16   taking the risk.

17        MR. LOZOW:  I understand.  You are the Judge.  May

18   I ask the defendant?

19        THE COURT:  You may.

20        MR. LOZOW:  Can we get a hearing within a few

21   weeks?

22        THE COURT:  Yes.

23        (Off-the-record discussion had.)

24        MR. LOZOW:  Your Honor, with all due respect, we

25   think Mr. Iley should be still on bond, but I understand

1    the Court's position.  I think it is important enough that

2    we do the work, that we would ask that the matter be

3    continued for a relatively short period of time.

4        THE COURT:  All right.  Ms. West -- so you want 2

5    weeks, 3 weeks?  I do start a trial the week after next

6    that goes for 2 weeks, supposedly.

7        MR. LOZOW:  I am sorry, you start a trial --

8        THE COURT:  I start a trial the 24th?

9        COURTROOM DEPUTY:  Yes, ma'am.

10       THE COURT:  But we do have the afternoons, if it

11   will not take long.  We have gone through the bulk of

12   this.  It would be argument from you and then the

13   sentencing.

14       MR. LOZOW:  Let me suggest, then, the afternoon of

15   the 21st, if you have that time or Mr. Larson has that

16   time.

17       THE COURT:  Let me see.  We have an investiture of

18   the new bankruptcy judge at that time in the afternoon.

19       MR. LOZOW:  Well, I want to have enough time to do

20   the work we need to do, Judge.

21       THE COURT:  We can do the afternoon.  Let's see, I

22   am picking the jury on Monday, so that won't work.  We can

23   do the afternoon of the 25th, at 3:00.

24       Is that correct, Ms. West?  Did I look at the

25   calendar at my calendar correctly?

1          COURTROOM DEPUTY:  Your Honor, I think that is

2     correct.  Let me check something real quick.

3          THE COURT:  The 25th at 3:00.  July 25th at 3:00

4     p.m.

5          COURTROOM DEPUTY:  Yes, ma'am, that would work.

6          MR. LOZOW:  I am sorry?

7          THE COURT:  July 25th, Tuesday, at 3:00 p.m.

8          MR. LOZOW:  I know Mr. Iley will be here, and I

9     will be here, as well.

10          THE COURT:  Mr. Larson, does that work for you?

11          MR. LARSON:  Your Honor, Government counsel can do

12     that, the 25th at 3 o'clock.  My case agent will not be

13     able to attend.

14          THE COURT:  Ms. West, would you please call the

15     Marshals.

16          I don't think we will need the case agent, do you?

17          MR. LARSON:  I suspect it will not be necessary.

18          THE COURT:  All right.  For purposes of the record,

19     then, the Court is going to -- Title 18 United States Code

20     Section 3143 states that the Court shall order that a

21     person who has been found guilty of an offense and who is

22     awaiting imposition or execution of sentence be detained

23     unless the Court finds by clear and convincing evidence

24     that the person is not likely to flee or pose a danger to

25     the safety of any other person or the community if

 1    released.

 2          Based on the conduct of the defendant in this case,

 3    and the Court's concern that Mr. Larson may have hidden

 4    sufficient assets to allow him to abscond to and live

 5    comfortable in another country, the Court cannot find that

 6    the defendant, by clear and convincing evidence, that he

 7    is not likely to flee.  Therefore, as such, the Court

 8    remands Donald Iley to the custody of the United States

 9    Marshal to be held until the sentencing hearing.

10          Mr. Larson?

11          MR. LARSON:  Your Honor, I just may have misheard.

12    I think there may have been a misspeak in suggesting that

13    Government's counsel may have hidden some assets, which

14    didn't happen.

15          THE COURT:  Government counsel may have what?

16          MR. LARSON:  When I heard that read out, I heard

17    that "Mr. Larson," when you may have meant "Mr. Iley."

18          THE COURT:  I am sorry.  You're right.  I didn't

19    mean to make you the defendant.

20          The Court is concerned that Mr. Iley may have

21    hidden sufficient assets to allow him to abscond and live

22    comfortably in another country.

23          I apologize, Mr. Larson.  I was just talking to

24    you, and that is what I said.  Thank you.

25          MR. LOZOW:  Your Honor, if I can make just a short

1    record on that.  I think there is no evidence, no credible

2    or competent evidence that there is either hidden assets

3    or some reason this client would flee or any indication

4    that the Government, who has access to all of the

5    evidence, all of the history, all of the cooperation, made

6    such a request.

7         So, for purposes of the record, I think the Court's

8    findings are not supported by the record.

9         THE COURT:  Well, I have to find by clear and

10   convincing evidence that he is not likely to flee.  What I

11   am saying is, he stole $9.7 million, and it is nowhere

12   accounted for.  And all I am saying is that without it

13   being accounted for, there may be hidden sufficient assets

14   to allow him to abscond and live comfortably.

15        And with a 15-year sentence facing him, I am afraid

16   that based on my past experience with defendants who have

17   committed similar crimes and whose assets have not yet

18   been found, have absconded.

19        So, for that reason, it is your burden to prove to

20   me by clear and convincing evidence that he will not flee.

21        MR. LOZOW:  Your Honor, it is usually the

22   Government's position --

23        THE COURT:  Not after sentencing or awaiting

24   sentencing, I don't believe.

25        MR. LOZOW:  I understand.  I just want to make the

1    record.

2        I think the Government has no evidence that it

3    could submit to you in a hearing that he has $10 million

4    that he may have access to and may abscond the country.  I

5    just think there is nothing to suggest that in any

6    finding, any bankruptcy finding.  We'll supplement what is

7    going on, but I think that reflects on our concerns about

8    the Court's decision on variance.

9        THE COURT:  All right.  So, we are waiting for the

10   Marshals -- CSO are you here to take -- here they are.

11       MR. LARSON:  Your Honor, if I may, I have a few

12   obligations in the plea agreement that I want to satisfy.

13       THE COURT:  All right.

14       MR. LARSON:  The first is that the Government

15   supports the recommendation of the probation office

16   regarding whether or not the defendant is allowed to

17   voluntarily surrender.  I want to put that on the record.

18   That's our obligation.

19       Additionally, I wanted to put on the record that

20   the Government's recommendation is for a 97-month

21   sentence, assuming the guideline range is offense level

22   30.  That is also the Government's obligation under the

23   plea agreement, and I wanted to put that on the record.

24       Finally, Your Honor, with respect to forfeiture, I

25   know that this Court entered on Monday a preliminary order

1    for forfeiture.  At some point -- this may not be the

2    correct time to do it.  But, at some point we would ask

3    the Court to modify that to reflect the amount of

4    restitution in this case, which is $9,718,327.68, to be

5    subject to forfeiture as the amount that was stolen, or

6    reflects the amount that was stolen and is subject to

7    forfeiture.

8            THE COURT:  All right.  Submit that in writing as

9    amended.

10           MR. LARSON:  We will, Your Honor.  Thank you.

11           MR. LOZOW:  All right.  Your Honor, I am assuming

12   we will have at least some additional time to supplement

13   our position in advance of the hearing so at least the

14   Government has some notice of it, the Court does.  I will

15   do the best I can to get something to you in a timely

16   fashion.

17           THE COURT:  All right.  Thank you, Mr. Lozow.

18           I hereby remand the defendant to the custody of the

19   United States Marshal.

20           (Proceedings conclude at 3:22 p.m.)

21

22

23

24

25

1
2          **R E P O R T E R ' S    C E R T I F I C A T E**
3
4          I, Darlene M. Martinez, Official Certified
5    Shorthand Reporter for the United States District Court,
6    District of Colorado, do hereby certify that the foregoing
7    is a true and accurate transcript of the proceedings had
8    as taken stenographically by me at the time and place
9    aforementioned.
10
11
12         Dated this 20th day of October, 2017.
13
14         _____
15         s/Darlene M. Martinez
16         RMR, CRR
17
18
19
20
21
22
23
24
25